Davis, Judge,
delivered the opinion of the court:
In this tax refund suit, we are asked to hold that the Commissioner of Internal Revenue improperly denied Re-cordak Corporation, a wholly-owned subsidiary of Eastman Kodak, capital gains treatment on the sale of certain microfilming equipment in 1954,1955, and 1956. The critical question, once again, is whether this property was “held by the taxpayer primarily for sale to customers in the ordinary course of * * * [its] trade or business.” Int. Rev. Code of 1954, § 1231.
Plaintiff has long been engaged in renting microfilming equipment on a month-to-month basis; it has also serviced the machines and supplied and developed the film necessary for their operation. From 1928 (or 1929) to 1950 this rental and servicing activity produced almost all the company’s income.[1] In 1950 there was a change in operation. To obtain working capital, plaintiff decided that as of July 31, 1950, it would sell as well as rent all of its stock of micro-filmers. The need for working capital ended in 1953, but the company has continued to give users the option to buy or rent its equipment. Since July 31, 1950, all microfilmers have been available either for sale or for rental. The plaintiff says that it continued this policy because in 1953 it developed the new model RM microfilmer which was more economical and faster in its operation than any of the older devices. It was expected that, once the RM was known to *296 be available,[2] the company’s regular customers would return the older models for replacement by the newer-type equipment. This forecast proved correct. In the taxable years (1954r-1956) an increasing number of older-type microfilmers were sent back by rental customers. In that period, plaintiff attempted to sell the older equipment for “stand-by” use by previous customers and also tried to interest new users who would not need the advantages of the improved model. It was successful in disposing of most of the pre-RM machinery by sales to consumers, under the one-year guarantee ivhich is standard in the industry; some of the sales, however, were made in “bulk” and plaintiff would provide only limited servicing. All of the machines sold in the taxable years were bought as microfilmers, but after 1956 much of the remaining pre-RM equipment was dismantled and sold for scrap or junk.
In the three taxable years, Recordak treated as long-term capital gain its income from sales of pre-RM machines first installed on rental more than six months prior to the date of sale. The Internal Revenue Service disallowed all capital gain[3] on the sales and assessed deficiencies on the basis that ordinary income had been realized. Plaintiff paid the deficiencies and filed claims for refund which were similarly rejected. This suit was then timely brought to recover $922,721.28 with interest, said to be the difference between a tax at ordinary income rates and one at the capital gains level.
Of the five pre-conditions to capital gains treatment (under Section 1231 of the Internal Revenue Code of 1954) for profits from sales of property, it is common ground that plaintiff can be assumed for this case to have met four (use of the property in trade or business, depreciability of the property, six months holding period, non-inventory property). The dispute is whether the machines sold in 1954AL956 were *297 “held * * * primarily for sale to customers in the ordinary course of * * * trade or business.” Plaintiff’s basic contention is that its business was a rental business and that its sale of pre-RM microfilmers was merely the non-recurrent liquidation of outmoded and obsolete equipment. The Government answers that since 1950 the company has had the regular policy of offering its devices either for sale or for rental and that they were therefore held in the taxable years for the purpose of sale.[4]
A basket-full of cases has applied this protean standard of Section 1231 (and its predecessors) to a string of varying situations. We know that there is no single test, that differences in the circumstances can be quite significant, and that a fair number of separate factors have been thought relevant (though none decisive in itself). See Oahu Sugar Co., Ltd. v. United States, 156 Ct. Cl. 546, 552, 300 F. 2d 773, 776-77 (1962);[5] Lazarus v. United States, 145 Ct. Cl. 541, 545-52, 172 F. Supp. 421, 423-28 (1959). Some courts have explicitly defined “primarily” (in the phrase “property held * * * primarily for sale,” etc.) as meaning, not “chiefly” or “predominantly,” but merely “substantially” or “essentially.” American Can Co. v. Commissioner, 317 F. 2d 604 (C.A. 2, 1963); Greene-Haldeman v. Commissioner, 282 F. 2d 884 (C.A. 9, 1960); Rollingwood Corp. v. Commissioner, 190 F. 2d 263 (C.A. 9, 1951); S.E.C. Corp. v. United States, 140 F. Supp. 717 (S.D.N.Y. 1956), aff'd per curiam, 241 F. 2d 416 (C.A. 2), cert. denied, 354 U.S. 909 (1957). Others have found it unnecessary or unhelpful to draw that particular distinction. E.g., Meridian, Inc. v. Commissioner, 12 A.F.T.R. 2d 5535 (C.A. 6, 1963); Tomlinson v. Dwelle, 318 F. 2d 60 (C.A. 5,1963); Hillard v. Commissioner, 281 F. 2d *298 279, 283 (C.A. 5, 1960) ; Philber Equip. Corp. v. Commissioner, 237 F. 2d 129, 131 (C.A. 3, 1956). Almost always, a major concern, expressed or understood, lias been to determine the ordinary course of the taxpayer’s business so as to discover whether the disputed sales were a part of, or outside, that normal stream. Business enterprise profits are to be taxed, as usual, at ordinary rates; property gains classed as separate from the main-stream of the enterprise will receive more lenient treatment. “Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by * * * [the capital assets provisions of the Code] applies to transactions on property which are not the normal source of business income.” Corn Prods. Ref. Co. v. Commissioner, 350 U.S. 46, 52 (1955).
This steady focus on the demarcation of the taxpayer’s business suggests that the statutory standard — whatever else it may or may not embrace — does forbid capital gains treatment for sales which form an accepted part of the taxpayer’s regular business. If the purchasers are properly considered customers of that regular business, the taxpayer’s dealings with them results in ordinary income. For the present case we can concentrate on this theme.
Since July 1950, plaintiff’s regular business has been the distribution of its microfilm machines through sale or rental. At that time it changed its previous policy of refusing to sell, announced to its customers that its microfilmers would be available for either lease or sale, and declared that “this sales policy applies not only to the machines which you are now using but also to Becordak products manufactured in the future.” (Finding 11(c).) Advertisements were run in the bank journals to this effect, and plaintiff continued through the taxable years to offer the equipment either for lease or rental. (Finding 11(d).) The sales organization handled rentals and sales indiscriminately. (Finding 19.) Sales became an increasing part of the business enterprise; the gross receipts from the sale of microfilmers and equipment, in 1956, actually exceeded in large measure the taxpayer’s gross rental income. In each of the years 1950-1956, *299 gross receipts from sales were very substantial, not only when considered by themselves, but when viewed in relation to the gross rental income for the respective years.[6] The short of it is that plaintiff’s policy of selling or renting, at the user’s option, has been consistently maintained since the middle of 1950.
We are told that it makes a difference that the initial decision of Recordak’s officers, in 1950, to sell was motivated by the need for working capital. In some situations, it may well be significant that a taxpayer who is solely in the rental or “investment” business decides to sell temporarily in order to meet the necessity of a current adverse condition. Cf. Oahu, Sugar Co., Ltd., v. United States, supra, 300 F. 2d 773. Here, however, the problem of working capital was solved in 1953, prior to the taxable years, but plaintiff nevertheless continued to sell. We are then told that from 1954 to 1956 plaintiff sold merely to dispose of obsolete property — the pre-EM equipment. But the sale policy also covered the new EM model, and ever since the disposal of the older equipment plaintiff has continued to offer its newer machines for sale. The long-continued change in operations which began in 1950 cannot be disregarded simply because plaintiff may have had some special reasons for adopting that modification in its initial stages. As it worked out, plaintiff’s program of sale-or-rent became an integral characteristic of its business. With respect to the pre-EM models merchandised to newly developed groups of users, the plan was as much a part of plaintiff’s regular business as the bargain basements or remainder sales of department stores which seek to dispose of goods left unsold on their counters. Unlike the “liquidation” cases (see Cebrian v. United States, 149 Ct. Cl. 357, 181 F. Supp. 412 (1960); Western & Southern Life Ins. Co. v. United States, 143 Ct. Cl. 460, 163 F. Supp. 827 (1958) ; Gordon v. United States, 141 Ct. Cl. 883, 159 F. Supp. 360 (1958); McConkey v. United States, 131 Ct. Cl. 690, 130 F. Supp. 621 (1955); Garrett v. United States, 128 *300 Ct. Cl. 100, 120 F. Supp. 193 (1954)), where property has been sold as a nonrecurring final disposition of a holding or business, Recordak used the funds obtained from the sales of its microfilmers, old and new, for the furtherance of its continuing sales and rental business.
Plaintiff seeks, too, to bring itself within the scope of the “rental-obsolescence” decisions holding that the sale of rental equipment, after it is no longer useful for renting, is taxable at capital gain rates. Hillard v. Commissioner, 281 F. 2d 279 (C.A. 5, 1960); Philber Equip. Corp. v. Commissioner, 237 F. 2d 129 (C.A. 3, 1956); Davidson v. Tomlinson, 165 F. Supp. 455 (S.D. Fla. 1958). These were automobile and truck rental cases in which the courts held or assumed that the taxpayers’ business was the rental business and not the dual-business of both selling and renting to customers. Recordak does not fall within that class: all of its equipment was available for sale or rental to its customers; although it did not advertise its older machines except to place them on its price list, it did advertise that it was in the business of selling as well as renting; and it maintained its own national sales force which sold or rented the machines as the user wished.
Nor can plaintiff succeed by hitching its wagon to the word “primarily.” Whatever the precise scope of that troublesome term in other contexts, it does not exclude from ordinary income the proceeds of sales by one, like plaintiff, who conducts a dual enterprise involving both rentals and sales of the same type of goods. In that setting, “primarily” invokes a contrast, not between selling and renting, but between selling in the ordinary course of business and selling outside of that normal course. Accordingly, if the entrepreneur holds out his wares either for sale or for rental, the taxation of his business gain from sales does not depend upon a comparison of sales to rentals in the particular year. S.E.C. Corp. v. United States, supra, 140 F. Supp. at 719. Regardless of that ratio, the goods are held “primarily for sale to customers in the ordinary course of * * * trade or business” because they are regularly offered for sale to customers as part of the normal operation of the enterprise. No case of this kind has allowed capital gains treatment. Very close is American Can Co. v. Commissioner, supra, 317 F. *301 2d 604 (C.A. 2, 1963). That taxpayer, too, entered into the business of selling machinery as well as renting when it had previously been in the business of leasing alone. Required by an antitrust decree either to offer its can-closing equipment for sale and rental or to divest itself of this line of business, the company chose the former path. The result was that the sales became part of its ordinary business and the profits taxable as such.[7]
The plaintiff is not entitled to recover. Its petition is dismissed.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and arguments of counsel, makes findings of fact as follow:
1. (a) The plaintiff is a Delaware corporation. It was incorporated on November 4, 1929, under the name of Recordak Service, Inc. On November 22, 1937, the plaintiff’s name was changed to Recordak Corporation.
(b) All of the plaintiff’s stock is owned by the Eastman Kodak Company.
2. Throughout its existence, the plaintiff has engaged in the business of purchasing, renting to others, and servicing Recordak microfilming equipment, and purchasing, selling, and processing film for use in such equipment.
3. Microfilming is a process of taking pictures on 16 mm. film, producing an image which is greatly reduced in size. Microfilming is used by banks and other businesses for maintaining permanent copies of documents and other records. The necessary microfilming equipment for a basic micro *302 filming installation consists of a microfilmer (including a film unit) and a film reader. Other auxiliary equipment, such as feeders, stackers, etc., can be obtained for a more complete microfilming installation.
4. Microfilming resulted from an invention made in the 1920’s by George L. McCarthy. Mr. McCarthy, who worked for a bank, was concerned over situations wherein depositors would claim that their accounts had been erroneously charged with nonexisting checks. Such claims presented serious problems to banks, inasmuch as the banks returned the depositors’ canceled checks to them monthly, and the banks thereby surrendered the primary evidence that the various items had been paid. Mr. McCarthy developed a device for photographing documents on photographic film. The device was called a “Check-O-Graph.” Mr. McCarthy attempted to interest bankers in his machine, but he did not have much success because of the deficiencies of the machine. It was large and cumbersome, and it could not photograph documents of all colors. The Eastman Kodak Company became interested in Mr. McCarthy’s invention and acquired from him rights to manufacture microfilming equipment under Mr. McCarthy’s patents. However, the McCarthy machine was discarded by Eastman, and a completely new microfilmer was developed by Eastman’s engineers. The new machine was called a Kecordak, the uame being a combination of “record” and “Kodak.” The Eastman Kodak Company organized the Kecordak Corporation to promote microfilming, and Mr. McCarthy was employed as general manager of the new corporation.
5. The purpose of the plaintiff corporation was to supply organizations with equipment and supplies for microfilming, i.e., photographically copying from documents in order that the users might obtain usable microfilm records of their documents. Customers were interested in this microfilming process to obtain usable microfilm records of their documents, rather than to acquire a machine. The plaintiff installed the microfilmer and related equipment with the user, taught him how to operate it, supplied him with the proper type of film for its use, developed the film, and *303 returned it to the customer. The plaintiff serviced the equipment, and saw to it that the machine functioned properly and produced the proper copies. Servicemen employed by the plaintiff went to the customers’ premises and made the necessary repairs to the equipment whenever it showed any small malfunction. There was a close, continuing relationship between the plaintiff and its customers.
6. (a) Prior to July 31,1950, the plaintiff’s policy was to rent exclusively its microfilming equipment to the public on a month-to-month basis. This policy of renting exclusively was adopted by the plaintiff for the following reasons: first, the plaintiff had to supervise continually the microfilming process in order to produce satisfactory microfilm records for its customers; second, the customers could obtain the equipment on a rental basis without making a large capital investment ; and third, it was more profitable for the plaintiff to rent the equipment than to sell it. Mr. McCarthy had a very strong view that Recordak equipment should be marketed through rental rather than sale.
(b) When the plaintiff installed microfilming equipment on rental, the lessee signed a statement to the effect that such equipment remained the property of the plaintiff.
(c) The plaintiff never granted to the lessees of its microfilming equipment an option to buy the equipment.
7. The plaintiff’s business was poor at the outset. However, about 1931-1932, the idea of microfilming documents began to be more widely accepted by banks, and the plaintiff’s business thereafter grew quite rapidly. The year 1937 was marked by a great increase in the microfilming business. In that year, the United States Government microfilmed all its original census records; and at about the same time, the Social Security Board began microfilming its records. Also, private businesses other than banks became more interested in the microfilming process and began to use microfilmers.
8. (a) The first equipment offered by the plaintiff was suitable only for microfilming bank records. During the 1930’s and prior to World War II, the plaintiff made improvements in its microfilmers and developed the following new models, which are listed opposite the first and last years in which such models were purchased by the plaintiff:

*304

(b) During tbe period of tbe Second World War, there were significant developments in the usage of microfilming, such as V-Mail and the microfilming by the Government of engineering drawings. The plaintiff developed new models of microfilmers during the war period, but could not market them to the public because of the wartime limitation on strategic materials that were required for the production of such equipment. When it became possible to do so, the plaintiff brought out and marketed the following additional new models:

The new models referred to in this paragraph (b) did not represent a radical change in comparison with the previous models, but, rather, they were improvements made to the older models (e.g., an improved clutch or some other improved mechanism resulting from the experience gained in servicing older models would be used). The only machine that was much different from the machines which the plaintiff had been producing was the RD model. This was the first duplex microfilmer produced by the plaintiff (taking pictures of both sides of a document at the same time). Duplex microfilmers had been produced by other manufacturers of microfilmer equipment since the late 1930’s.
(c) Between 1950 and 1953, the plaintiff introduced the following additional models of microfilmers:

*305

9. (a) The plaintiff’s basic monthly rental charge for its commercial microfilmer models between 1943 and 1946 was $30 per month. The basic monthly rental for the plaintiff’s junior microfilmer models between 1939 (the first year when junior models were made available) and 1946 was $12.50 per month. The rental charge included all mechanical service on the equipment.
(b) Increases were made in the basic rental charge for commercial' microfilmers in 1947 and 1948, the highest rental charge in 1948 being $42.50 per month for the RE-1 model. In 1949, the RF model was rented for $60 per month.
(c) Increases were made in the basic rental charge for junior models in 1947 and 1949, the highest rental charge in 1949 being $20 per month for the JC-1 model. Other junior models rented for $15 and $17.50 per month in 1949.
10. (a) The plaintiff purchased its microfilming equipment and film from its parent corporation, the Eastman Kodak Company. During the years 1941 through 1956, the plaintiff purchased the following number of microfilmer units and auxiliary equipment at the costs indicated:

*306 (b) As of the close of each of the taxable years 1928 through 1956,[1] the total number of microfilmers owned by the plaintiff, including a breakdown of those installed on rental and those not installed on rental, was as follows:

During the period from 1946 to 1949, the number of micro-filmers purchased by the plaintiff, the number owned by the plaintiff, and the number installed on rental by the plaintiff increased substantially, as shown in the immediately preceding table, by reason of the pent-up demand for microfilmer equipment resulting from the development of increased usages for microfilming and from the fact that microfilmer production had been curtailed during the Second World War by reason of governmental restrictions. It was to meet this pent-up demand that the plaintiff purchased substantially larger numbers of microfilmers and proceeded to rent greater numbers of microfilmers.
*307 11. (a) The consequence of the investment of capital in new equipment was that the plaintiff suffered a substantial decline in working capital during the period 1946 to 1949. The net working capital of the plaintiff during the period 1941 through 1949 was as follows:

Year Net working capital

1941 ________________________________________ $198, 741
1942 ________________________________________ 549,254
1943 ________________________________________ 984,759
1944 ________________________________________ 1,399,905
1945 ________________________________________ 2,100,799
1946 ________________________________________ 2,066,174
1947 ________________________________________ 804,163
1948 ________________________________________ (800,279)
1949 -1______________________________________ (1, 511, 691)
The plaintiff’s officers were of the view that its rental charge could not be increased sufficiently to offset this working capital decline, since much of the microfilming equipment had been rented for a considerable number of years and the newer models did not perform any functions that the older machines would not perform.
(b) In the period 1946-1949, the plaintiff’s investment in net depreciable assets (cost less reserve for depreciation) increased as follows:

Year Net depreciable assets

1946 -----------------------------------------$1,062,924
1947 _________________________________________ 3,366,531
1948 _________________________________________ 6,064,195
1949 ____________________________1____________ 7,965,864
(c) In an effort to solve its working capital problem, the plaintiff announced that as of July 31,1950, its microfilming equipment could either be rented or purchased. The announcement was phrased in the following language:
July 27,1950.

To All Recordáis Ouslomers:

We are glad to announce that as of July 31, 1950, Recordak Microfilming equipment now rented to customers will become available on either a sales or a rental basis — whichever they may desire. This sales policy applies not only to the machines which you are now using but also to any Recordak products manufactured in the future.
*308 There is attached a price list showing the sales price of the various models of microfilming units, film readers and other accessories. You will notice that a reduced price applies to the equipment that you are now using. This low price can be quoted to you because no sales commission, installation or transportation costs are involved.
Important from your standpoint is the fact that all used equipment that you may purchase is guaranteed for two years from date of purchase and free mechanical service will be rendered during this period.
Recordak sales representatives will be pleased to answer any questions that may arise concerning the price list.
We are happy indeed to make Recordak equipment which has been thoroughly tried and tested in thousands of installations throughout the country and which your own experience proves will meet the needs of your business, available on a sales basis to those customers who prefer out-right ownership.
Recordak Corporation,
George L. McCarthy,

President.

The reference in the second paragraph of the announcement to a reduced price on equipment out on rental was to a credit allowance based upon the length of time the user had rented it. The purpose of the allowance was to give the user an extra incentive to purchase the equipment he was then renting. The plaintiff discontinued the allowance at the end of 1951.
(d) In September and October of 1950, the plaintiff ran an advertisement in bank journals titled as follows: “Now * * * every bank has this choice — you can BUY or RENT.” The advertisement announced the plaintiff’s new sales policy, including the credit allowance and free service for 2 years from the date of purchase, including parts replacement if necessary. In December 1950, the plaintiff ran another advertisement in bank journals which included the following statement: “Learn the whole story on Recordak Single Posting * * * and Recordak’s new ‘Buy or Rent Plan,’ which gives you microfilming equipment designed for the volume of your bank on the hasis you yreferP During the years in question, 1954 through 1956, plaintiff’s adver *309 tisements for its microfilming equipment stated that the equipment was available to customers either on a rental basis or on a sales basis.
12. In the years following 1950, the plaintiff’s working capital deficit was eliminated. The plaintiff’s net working capital for the years 1950 through 1953 was as follows:

Tear Net worMng capital

1950 ----1-------------------------------------- $375,872
1951 ___________________________________________ 3,492,360
1952 ___________________________________________ 4,802, 631
1953 ------------------------------------------- 6,487,362
By the end of 1953, the plaintiff’s working capital problem had largely been solved.
13. In 1953, the plaintiff developed a new microfilmer, known as the Reliant or model RM, which was far superior to anything else in the microfilming industry at that time. The model RM was a small, desk-type, portable unit that operated at much faster speed than the older microfilmers. It photographed both sides of more than 400 bank checks per minute. In addition, the model RM photographed documents across the complete width of the 16 mm. film, and it operated at a much greater reduction ratio than the earlier microfilmers. With a 40-diameter reduction ratio, the RM reduced the picture of the document on the film to one-fortieth the width and one-fortieth the length of the original document. This made it possible for many more documents to be photographed on the same amount of film than had formerly been possible, and it reduced the user’s film cost to one-quarter of what it had been previously. Also, the model RM operated as a dual machine, in that it could take documents much larger than the previous microfilmers took and could photograph one row of documents along the left-hand side of the film, then turn the camera around and photograph along the right-hand side of the film, thereby putting twice as many documents on the film. Furthermore, the model RM had a new type of camera that resulted in improved pictures, and the film unit was built into the RM microfilmer, as was an automatic feeder (a device to feed one document at a time to the microfilmer at a speed of 400 per minute). Previous microfilmers did not have these built-in *310 features. The model RM was an all-purpose microfilmer that could be used anywhere, as a duplex or dual microfilmer. The detailed specifications for the model RM were determined and fixed in 1953. On December 28,1953, the plaintiff ordered the delivery of 2,000 model RM microfilmers. However, it was not until 1955 that the first RM was delivered to or acquired by the plaintiff.
14. The model RM was so superior to existing microfilmers that the plaintiff’s officers believed that when the RM was made available, it would “sweep the market.” It was anticipated that the older microfilmer equipment, although still usable, would be regarded by the plaintiff’s rental customers as obsolete, and that the plaintiff would be “flooded” with older microfilmers returned to it by rental customers, particularly those in the banking field. This expectation was borne out by subsequent events. In 1954,1955, and 1956, an increasing number of microfilmers were returned to the plaintiff by its rental customers. The increase in the number of microfilmers “in stock,” that is, in the warehouse and not on rental or otherwise being used, is shown by the following table:

Year Number in stock

December 1953___________________________1,863
December 1954--------------------------- 2,235
December 1955--------------------------- 3,355
December 1956--------------------------- 4,468
With respect to the increase of 372 microfilmers “in stock” between December 1953 and December 1954, none was a model RM. The increase of 1,120 microfilmers “in stock” between December 1954 and December 1955 included 150 model RM’s, but that number of the newer machines was considered an inadequate stock for business operations. The increase of 1,113 microfilmers “in stock” between December 1955 and December 1956 included 401 model RM’s, which was not considered excessive stock for business operations. The plaintiff rented additional storage space in Long Island City, New York, and Chicago, Illinois, for the storage of equipment being returned from rental.
15. (a) After the development of the model RM micro-filmer in 1953, the plaintiff attempted in various ways to *311 sell the older microfilmer equipment. For example, the plaintiff attempted to interest new types of users in the older microfilmers, such as small telephone companies, garment and specialty dress shops, and other “marginal” users who perhaps would use a microfilmer if the cost were not too great. Also, when rental customers indicated that they were returning the older equipment in order to obtain the newer microfilmer, the plaintiff sought to dispose of the older equipment to the customers for use as stand-by units. The plaintiff attempted to sell pre-RM microfilmers in bulk sales at less than the standard price, and some such sales were made during the years 1954, 1955, and 1956. The sales of older microfilmers in bulk were not made under the standard conditions of sale, inasmuch as the purchaser would have to pay for all servicing, and the plaintiff agreed to service such equipment only as long as it had parts available for servicing. The plaintiff also sold the older equipment in bulk on the understanding that it would subsequently have no trade-in value.
(b) No credit allowance was given for rentals previously paid with respect to sales of older equipment during the years in question.
(c) The plaintiff conducted no special advertising with respect to the sale of the older equipment, other than listing the equipment on the plaintiff’s price lists.
(d) The plaintiff was fairly successful in disposing of its older equipment. After 1956, however, when the plaintiff was unable to find additional persons who would buy such equipment, much of the older equipment was dismantled, broken up, and sold as scrap iron for junk.
16. On equipment sold in the years 1954 through 1956, the plaintiff gave a 1-year guarantee, which was standard in the industry.
17. None of the machines sold in the years 1954 through 1956 was sold for junk. They were all sold for microfilming purposes.
18. Since July 31, 1950, all of the plaintiff’s microfilming equipment has been available for sale or rental.
19. During the years 1950 through 1956, the plaintiff had a national sales organization, with branch offices in New *312 York City and throughout the country. By the end of 1956, the plaintiff had 27 branch offices. Salesmen traveled out from the branch offices in order to interest customers in microfilmers and service. Each branch office had a manager, salesmen, servicemen, a film salesman, a film processing supervisor, and a film processing man. In 1954, the plaintiff had between 50 and 60 salesmen and, by 1956, the number had increased to 75. The plaintiff did not have special salesmen who handled rentals only and other salesmen who handled sales only. Instead, each salesman handled the sales as well as rentals in his territory. On equipment that was sold, the plaintiff’s salesmen made sure that it was properly installed, and the salesmen and servicemen instructed the customers’ personnel on how to operate the equipment. This instruction was also given with respect to rented equipment, and the instruction was included in the sale price or rental charges.
20. During the years 1954 through 1956, the plaintiff had four departments, each of which was concerned with a different group of customers. Despite the fact that each department was concerned with rentals as well as sales, the. departments were referred to as “sales departments.”
21. (a) During the years 1950 through 1956, the plaintiff sold the following number of microfilmers:

Year Microfilmers sold

1950 _______________________________________________1,541'
1951 _______________________________________________2,497
1952 _______________________________________________1,115
1953 _______________________________________________2,176
1954 _______________________________________________ 2,409
1955 _______________________________________________2,558
1956 _______________________________________________3, 078
In addition to the microfilmers, the plaintiff also sold in those years a certain quantity of auxiliary equipment.
(b) The plaintiff sold 423 model EM microfilmers in 1955 and 1,755 EM’s in 1956.
22. During the years 1950 through 1956, the plaintiff’s gross receipts from sales of microfilmers and auxiliary equipment and from rentals were as follows:

*313

23. (a) During 1954, the plaintiff lost a net of 1,027 micro-filmer rental installations by reason of withdrawals from rental and sales of units of microfilmers from rental. The number of withdrawals of microfilmer rental installations was 1,684, and the number of microfilmer units sold from rental was 1,216. The following is a recapitulation of microfilmer installations for the year 1954 by models:

(b) In 1955, the plaintiff lost a net of 1,579 microfilmer rental installations by reason of withdrawals of microfilmer installations from rental and sales of microfilmers from rental. The number of withdrawals of microfilmer installations from rental was 2,705, and the number of micro-filmers sold from rental was 722. The following is a recapitulation of microfilmer installations for the year 1955 by models:

*314

(c) In 1956, the plaintiff lost a net of 1,368 microfilmer rental installations by reason of withdrawals of microfilmers from rental and the sale of microfilmers from rental. The number of withdrawals of rental microfilmer installations was 2,531, and the number of microfilmers sold from rental was 449. The following is a recapitulation of microfilmer installations for the year 1956 by models:

(d) As of the end of 1953, the plaintiff had 11,487 rental installations of microfilmers, of which none consisted of the model RM. As of the end of 1956, the plaintiff had 7,513 *315 rental installations of microfilmers, of which 538 consisted of the model RM.
24. (a) Upon acquisition by the plaintiff, and at all times thereafter, all microfilmers and auxiliary microfilmer equipment were reflected on the plaintiff’s books and records as property subject to depreciation, and not as inventory. The plaintiff was allowed depreciation on such microfilmers and equipment by the Commissioner of Internal Revenue: (1) for the period between acquisition and initial rental and thereafter while rented; (2) for any period after the initial rental during which the equipment was not out on rental; and (3) for the period between acquisition and sale if never rented.
(b) In maintaining its books and records for business and for tax purposes, the plaintiff keeps an individual card record on each piece of microfilming equipment owned by it. On such cards, the plaintiff records the date when the piece of equipment was received, its cost, the dates on which such equipment was installed on rental (showing the names of the lessees and also the dates when returned to stock and rerented), and, if sold, the date of sale.
(c) The plaintiff also maintains an individual card record with respect to each customer who rents a piece of microfilming equipment, showing the date and type of equipment instaEed on rental with such customer and any subsequent change with respect to the equipment on rental with such customer.
(d) In maintaining its books and records, the plaintiff kept in columnar schedule form a record with respect to each individual piece of microfilmer equipment sold by it in the taxable years ending after August 1, 1950, showing the model, serial number, date entered as a depreciable asset on plaintiff’s books, date sold, cost, selling price, depreciation, and the gain or loss on the sale of such equipment, together with the invoice number and the plaintiff’s designation as to whether the gain on such sale was long-term or short-term capital gain.
25. (a) On the plaintiff’s Federal income tax return for the year 1950, the plaintiff claimed capital gain on all *316 Recordak microfilmer equipment sold by the plaintiff during that year which had been owned by the plaintiff for at least 6 months prior to the date of sale. Upon audit, the Internal Revenue Service allowed capital gain on sales of Recordak microfilmer equipment, without change as to the microfilmer equipment upon which the plaintiff claimed capital gain.
(b) On the plaintiff’s Federal income tax return for the year 1951, the plaintiff claimed capital gain on all Recordak microfilmer equipment sold during that year which had been owned by the plaintiff for at least 6 months prior to the date of sale. Upon audit, the Internal Revenue Service allowed capital gain on sales of Recordak microfilmer equipment first installed on rental more than 6 months prior to the date of sale.
(c) On the plaintiff’s Federal income tax return for the year 1952, the plaintiff claimed capital gain on all Recordak microfilmer equipment sold during that year which had been owned by the plaintiff for at least 6 months prior to the date of sale. Upon audit, the Internal Revenue Service allowed capital gain on sales of Recordak microfilmer equipment first installed on rental more than 6 months prior to the date of sale.
(d) On the plaintiff’s Federal income tax return for the year 1953, the plaintiff claimed capital gain on all Recordak microfilmer equipment sold during that year which had been first installed on rental more than 6 months prior to the date of sale. Upon audit, this capital gain treatment was accepted as filed.
26. (a) During the year that ended December 26, 1954, the plaintiff sold 2,107 microfilmers which had been first installed on rental more than 6 months prior to the date of sale, at a total gain of $1,162,325. During the same year, the plaintiff sold auxiliary equipment which had been first installed on rental more than 6 months prior to the date of sale, at a total gain of $309,497. Hence, the total gain on such microfilmers and auxiliary equipment amounted to $1,471,822. Of the 2,107 microfilmers which had been first installed on rental more than 6 months prior to the date of sale, 1,853 microfilmers had been acquired prior to August 1, *317 1950; and the gain on the sale of the 1,853 microfilmers and the related auxiliary equipment was $1,219,451.
(b) The plaintiff filed a timely income tax return for the year ended December 26,1954, and included in gross income the amount of $1,471,822 as long-term capital gain on the sale of microfilming equipment which had first been installed on rental by the plaintiff more than 6 months prior to the date of sale. Upon audit, the Commissioner of Internal Revenue initially allowed long-term capital gain on the sale in 1954 of microfilming equipment which had been owned by the plaintiff prior to August 1, 1950, and which had been continuously rented to the same customer to the date of sale; but the Commissioner disallowed the remainder of the long-term capital gain claimed, and assessed a deficiency. Subsequently, the Commissioner of Internal Revenue determined an additional deficiency for the year ended December 26, •1954, on the basis of disallowing all capital gain on the sale of microfilming equipment during that year. The plaintiff paid the deficiencies in tax determined for the year ended December 26, 1954, and filed a timely claim for refund.
27. (a) During the year that -ended December 25, 1955, the plaintiff sold 1,560 microfilmers which had been first installed on rental more than 6 months prior to the date of sale, at a total gain of $842,701. During the same year, the plaintiff sold auxiliary equipment which had been first installed on rental more than 6 months prior to the date of sale, at a total gain of $286,869. Hence, the total gain on such microfilmers and auxiliary equipment amounted to $1,129,570. Of the 1,560 microfilmers, 1,206 had been acquired prior to August 1, 1950, and the gain on the sale of the 1,206 micro--filmers and related auxiliary equipment was $842,439.
(b) The plaintiff filed a timely income tax return for the year ended December 25, 1955, and included in gross income ■the amount of $1,129,570 as long-term capital gain on the sale of microfilming equipment which had been first installed on rental,more than 6 months prior to the date of sale. Upon audit, the Commissioner of Internal Revenue initially allowed long-term capital gain on the sale in 1955 of microfilming equipment which had been owned by the plaintiff *318 prior to August 1, 1950, and which had been first installed on rental more than 6 months prior to the date of sale; but the Commissioner disallowed the remainder of the long-term capital gain claimed, and assessed a deficiency. Subsequently, the Commissioner of Internal Eevenue determined an additional deficiency for the year ended December 25, 1955, on the basis of disallowing all capital gain on the sale of microfilming equipment during that year. The plaintiff paid the deficiencies in tax determined for the year ended December 25,1955, and filed a timely claim for refund.
28. (a) During the year that ended December 30, 1956, the plaintiff sold 1,101 microfilmers which had been first installed on rental more than 6 months prior to the date of sale, at a total gain of $627,990. During the same year, the plaintiff sold auxiliary equipment which had been first installed on rental more than 6 months prior to the date of sale, at a total gain of $285,998. Hence, the total gain on such microfilmers and auxiliary equipment amounted to $913,988. Of the 1,101 microfilmers, 829 had been acquired prior to August 1, 1950, and the gain on the sale of the 829 microfilmers and related auxiliary equipment was $602,978.
(b) The plaintiff filed a timely income tax return for the year ended December 30, 1956, and included in gross income the amount of $913,988 as long-term capital gain on the sale of microfilming equipment which had been first installed on rental more than 6 months prior to the date of sale. Upon audit, the Commissioner of Internal Eevenue initially allowed long-term capital gain on the sale in 1956 of microfilming equipment which had been owned by the plaintiff prior to August 1, 1950, and which had been first installed on rental more than 6 months prior to the date of sale; but the Commissioner disallowed the remainder of the long-term capital gain claimed, and assessed a deficiency. Subsequently, the Commissioner of Internal Eevenue determined an additional deficiency for the year ended December 30, 1956, on the basis of disallowing all capital gain on the sale of microfilming equipment during that year. The plaintiff paid the deficiencies in tax determined for the year ended December 30,1956, and filed a timely claim for refund.
*319 29. The Commissioner of Internal Revenue disallowed the claims for refund filed by the plaintiff for the years ended December 26, 1954, December 25,1955, and December 30, 1956, as indicated in findings 26, 27, and 28. This suit was timely brought by the plaintiff.
30. (a) During the years in issue in this case, the plaintiff sold microfilming equipment which it had owned for more than 6 months but which had not been first installed on rental more than 6 months prior to the date of sale. The gain on such equipment was not reported as long-term capital gain for the years in issue, and it is not involved in this proceeding.
(b) The number of microfilmers sold by the plaintiff during the years in issue which had not been first installed on rental more than 6 months prior to the date of sale and the gain on which was not claimed by the plaintiff as long-term capital gain, and the years of acquisition of such microfilmers, are shown on the following table:

Of the 692 microfilmers sold in 1955 which were acquired in 1955, as shown in the preceding table, 423 were model RM microfilmers. Of the 407 microfilmers sold in 1956 which were acquired in 1955,251 were model RM microfilmers. Of the 1,529 microfilmers sold in 1956 which were acquired in 1956,1,504 were model RM microfilmers.
31. The following tables show the number of microfilmers sold by the plaintiff during the years in issue in this case which had been first installed on rental more than 6 months prior to the date of sale, the date on which such equipment was acquired by the plaintiff, and the gain on such equipment (which is the gain in issue in this case):

*320

*321

CONCLUSION 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is therefore dismissed.

 In 1936 and 1937 some sales of microfilming equipment wore made, but they were negligible.

 Eastman Kodak manufactured tlie microfilmers and sold them to plaintiff. The first RMs were ordered by plaintiff on December 28, 1953, but were not actually acquired by it until 1955; they were made available to customers in that year.

 The Service, at first, allowed capital gains treatment as to some of the income (that pertaining to sales of equipment acquired prior to 1950), but ultimately all capital gains treatment on the sales was disallowed.

 Bach side charges the other with inconsistency in the tax treatment of comparable sales in prior years. We regard these earlier positions as irrelevant to the correct disposition of the issue for the three years now in question.

 In Oahu, this court said: “* * * the issue is a question of fact and one not unfamiliar to this court. Several tests have evolved, none of them singularly determinative, as touchstones. We have considered as important the purpose for which the property was acquired; the motives for selling as subdivided acreage ; the extent of the development and improvement of the property; the activities of the taxpayer, and his agents, in promoting sales, and the frequency and continuity of sales.”

 See Finding 22. The figures for the taxable years are as follows: in 1954, gross receipts from sales were $3,195,908, as compared to $5,162,679 in gross rental income; in 1955, the former was $4,201,915 and the latter $4,813,508; in 1956, the sales mounted to $5,657,157 and the rental income declined to $4,246,454. Were we to use “net” figures, as the taxpayer maintains, they would nonetheless show a very large sales business.

 In the alternative, plaintiff claims that at least the microfilming equipment acquired on or before July 31, 1950 (the date of the change in policy), and which was first rented more than six months prior to sale, should be accorded capital gains treatment. The answer is that, by the time of the taxable years (1954-1956), this machinery was held primarily for sale in the ordinary course of business along with later-acquired devices. Plaintiff says, however, that Rev. Rul. 62-141, 1962-35 Int. Rev. Bull. 9, on motion picture films used for television, requires capital gain treatment for property acquired and held for rent before the “cut-off” date on which the owner decides to adopt the policy of selling or renting, even though the property is sold well thereafter. This is an incorrect reading of the ruling which says no more than that the Internal Revenue Service will determine, on the basis of all the facts and circumstances, whether such previously acquired items were held for sale in the ordinary course of business (within section 1231) at the time they were actually sold.

 While the plaintiff’s tax returns for 1954 through 1956 were prepared on a basis slightly different from the calendar year, for convenience it is assumed that all returns were filed on the calendar year basis.

Includes no-cbarge installations, in-lransit equipment, equipment in repair shops, and available stock.