**ARMCO STEEL CORPORATION,**
Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 5062.**

United States District Court
S. D. Ohio, W. D.

Dec. 30, 1966.

Thomas W. Kelly, Paul L. Peyton, New York City, James G. Headley, Cincinnati, Ohio, for plaintiff.

Arthur Biggins, Justice Dept., Washington, D. C., Charles G. Heyd, First Asst. U. S. Atty., Cincinnati, Ohio, for defendant.

## MEMORANDUM OPINION

JOHN W. PECK, District Judge *.

This cause was tried to the Court sitting without a jury, and it seems proper to here repeat in substance a statement made from the bench at the termination of that trial. The presentation of the exceptionally complicated factual pattern was entirely unique in our experience. A normal presentation of this case, tried without pretrial and on an arm's length basis on the part of counsel, could easily have consumed five or six weeks. In sharp contrast, due to the cooperative attitude of counsel for both parties, an almost staggering amount of preparation, stipulations as to all but the essentially controverted facts, elimination of all side questions and a critical sharpening of the issues, submission of the cause was accomplished in less than two days. Plaintiff's experts, aided by meticulously prepared exhibits, made clear explanations of the involved technical aspects of its case. Defendant relied on adroit cross-examination of plaintiff's top level personnel, who responded frankly and fully, to establish the defense. Correspondingly helpful briefs

* Now Circuit Judge.

have been received. Some of the points therein debated are not dealt with in this relatively abbreviated opinion, but that is not to say that they have not been fully considered. On the contrary, they have been carefully studied and conclusions arrived at which are consistent with the determination herein made, but it is felt that elaboration concerning such points would be superfluous.

While the number of dollars at issue does not necessarily reflect the difficulties of the issues in a law suit, when it is remembered that the $1,784,493.49 (plus interest) here sought to be recovered by plaintiff represents only the difference it paid on profits taxed on the basis of ordinary income over what it would have paid on that profit taxed as a long-term capital gain, something of the magnitude of the global operations involved can be envisaged. It should be added that we are convinced that the abbreviated and concentrated presentation which was made gave the Court a far better understanding of the facts and issues than would have resulted from a protracted trial including repetitious corroboration and dragging out over weeks.

To preliminarily understate the issue, plaintiff (usually hereinafter referred to as "Armco" or "taxpayer"[1]) contends that in worldwide transactions it made sales (or transfers conveying all substantial rights) of patents held by it for more than six months, and that such technical advice, instruction and assistance as was supplied was only ancillary to the sales. Defendant (usually hereinafter referred to as the "Government") primarily contends that the subject of the transactions was such technical advice, instruction and assistance and that all of the consideration received is therefore taxable as ordinary income; alternatively, it contends that part of such consideration was for the patent rights, the balance having been received for advice, instructions and assistance, and requests an allocation of profits to each of those two categories at a second trial. The issues and provisions for a second trial are set forth in the Pretrial Order (as modified by stipulation at the termination of the trial) as follows:

"II. (a) The issues in this case were defined, limited, and framed as being composed solely of the following:

"1. Did the taxpayer by all or any of the agreements transfer property rights in certain foreign patents and/or related 'know-how' to the several foreign steel producers to such an extent and degree as to constitute a sale such that all or any part of the payments made pursuant to the agreements should have been reported and taxed as long term capital gain?

"2. Did the aforesaid patents constitute 'property used in the trade or business' of the taxpayer as defined in Section 1231?

"3. Were the inventions covered by the aforesaid patents held for more than six months prior to their transfer pursuant to the applicable agreement, as required by the provisions of the Internal Revenue Code?

"4. Was any part of the payments received under the various agreements for a consideration other than the sale or transfer:

"a. in the case of the aforesaid patents, of property 'used in the

---

1. Reference will also be made to Armco International Corporation (AIC), which was organized as a wholly-owned subsidiary of the plaintiff for the purpose of conducting its overseas business. During the three years here involved, AIC employed 3,500 to 4,000 persons in its overseas selling and manufacturing operations, and in one of those years, as an example, consolidated net receipts from the sale of Armco and AIC produced steel and steel products exceeded $100,-000,000. In the same year AIC sales of other products (e. g., Lukens Steel Co. and Lincoln Electric Co.) on a 2½% commission basis amounted to another $32,000,000.

trade or business' held for more than six months, and

If so, in what amount?

"(b) Separate trial shall be had as to the issues aforesaid to the extent that those numbered 1, 2 and 3 shall be tried and determined first in one trial. If the defendant is then found to have prevailed to the extent that there is no need or occasion for any determination of the final issue stated in item 4 above, a suitable judgment warranted by the circumstances and determination shall then enter. If not, there shall, on a subsequent date to be fixed by the Court, be a separate trial on item 4 and the entry of such final judgment as is warranted by the circumstances and determination then made."

The agreements referred to in the Pretrial Order (and which form the basis of this suit) are five in number. They were received in evidence as Exhibits 1 through 5, and will hereinafter be referred to by the designation which appears within the quotation marks in the following listing:

1. *The British Agreement with "RTB"* (Exhibit 1). This agreement, dated July 15, 1953, was made by AIC with Richard Thomas & Baldwins, Ltd. and The Steel Company of Wales, Ltd.

2. *The French Agreement with "Chatillon"* (Exhibit 2). This agreement, dated April 25, 1952, was made by AIC with Compagnie des Forges de Chatillon and Union Siderurguique du Nord.

3. *The Belgium Agreement with "Cockerill"* (Exhibit 3). This agreement, dated April 1, 1957, was made by AIC with Society Anonyme Cockerill-Ougree.

4. *The Swedish Agreement with "Surahammars"* (Exhibit 4). This agreement, dated May 15, 1957, was made by AIC with Surahammars Bruks Aktiebolag.

5. *The Japanese Agreement with "Yawata"* (Exhibit 5). This agreement, dated February 6, 1958, was made by AIC with Yawata Iron and Steel Company.

There is no dispute as to the amounts received by taxpayer under any of the above agreements, and it concedes that they resulted in payments to it in all or some of the three tax years in issue, those being 1957, 1958 and 1959.

The product which is covered by the patent and which is consequently that involved in this action is oriented electrical steel, and both parties have accepted this definition:

"A cold rolled silicon electrical steel characterized by highly directional magnetic properties in the direction of rolling with core loss in normal production not higher than .80 watts per pound at fifteen kilogauses at a thickness of .014 inches."

The product is less technically described as a specialty steel product of a highly sophisticated character used in the manufacture of electrical transformers and giving to them a greatly increased capability not previously available from conventional steel material. This product was described less technically still in the testimony as being thin sheets of steel; that a core is made up by assembling the sheets "layer upon a layer, upon a layer, or laminated, one behind the other," and "used in the manufacture of electrical motors, generators, and especially in transformers, transformers such as are used in radio sets and televisions, and those that hang behind our houses on utility poles for the distribution of power." (Testimony of R. L. Davidson, Armco's director of chemical research.)

At trial the structure, character and properties were described in detailed testimony aided by models. It was thereby established that prior to 1940 the steel plates used in transformers, motors, generators and other units were made up of disoriented, nondirectional or random crystals. In the processing of these earlier sheets no effort was done to make the crystals orient in any given way, "and they tended to be turned more

or less randomly in different directions," causing the permeability of the sheet to be "somewhat mediocre." (Testimony of R. L. Davidson.)

In the steel sheets produced under the process here involved, the crystals are "oriented" in the same direction, resulting in a sheet of very superior magnetic qualities. An expert witness further testified that if this "oriented sheet is built into a transformer in such a way that the magnetic flux is made to flow parallel to this best direction of the sheet, then a transformer results which has a very superior performance to a transformer made of conventional steel."

Thus, again reducing the expression to lay terms, it is sufficient for present purposes to say that the distinction between oriented and nonoriented steel is that the molecular structure is parallel in the former, in contrast to the random pattern of the latter, resulting in a vastly superior and more efficient product.

Throughout these entire proceedings, from pretrial through final briefing, the parties have been in substantial agreement as to the general history of Armco, its development of steel specialties in general and its development of oriented electrical steel in particular. As is to be expected, however, they differ sharply in the emphasis given to various portions of the transcript and of the exhibits and as to the conclusions to be drawn therefrom. In the opening lines of its Statement the Government in its brief quotes from an exhibit to support the assertion, "Armco is the world's 'leading producer of special purpose, high quality steels.'" By extensive further quotations from the evidence both parties' briefs chronicle the story of taxpayer's achievements. A summary review will serve for present purposes. .

Armco's initial decision in the early days of the 20th Century to specialize in the production of special purpose, high quality steels was grounded upon survival considerations. It was in competition with older and larger producers of tonnage steel, and decided that its best chances of success lay in the specialties. Some part of this determination was based on the fact that while the chances of successfully competing in Europe with producers there in the area of heavier steel commodities were slight, opportunities for competition did exist concerning the special purpose, high quality steels. The Government places emphasis on the fact that in these early days Armco recognized the fact that it was not sufficient to merely produce these quality steels, it was also necessary "to create the market for it, demand for it," and that even then taxpayer had to "export Armco's marketing techniques and sales know-how. This was the mission and accomplishment of AIC, the first international sales organization established by an American steel company." AIC acted initially as such a sales organization, and later provided know-how for compensation.

As one of taxpayer's executives testified, an American exporter can only expect to be free from competition of local European producers for a limited time. Thereafter such competition may reasonably be expected to be enhanced by local economic and political factors which ultimately, when added to transportation and allied costs, cause the remote operation to become economically unsound. As will be hereinafter mentioned in further detail, this had been the history of a number of major Armco specialties prior to the oriented electrical steel experience.

In the case of oriented electrical steel this evolutionary development proceeded at a greatly accelerated pace compared with the cycle followed with earlier products. Armco developed this revolutionary steel in collaboration with Westinghouse Electric Corp. in 1940. It made possible a great reduction in the size of transformers, produced at lower costs, with electrical performance improved by as much as one-third. Its use in other types of equipment (e. g., motors and generators) produced similarly dramatic results. After reviewing them, one of taxpayer's experts testified, "There is

not a country outside the Iron and Bamboo curtains that hasn't benefited by this. There is not an individual that either uses electricity directly or indirectly but what [sic] has benefited by this development." (Testimony of V. W. Carpenter, Armco's Director, Magnetic Materials Research.)

The immediate acceptance of the product in the world market made it virtually impossible for the supply to meet the demand, and the AIC executive primarily responsible for supplying the foreign market had troubles. He testified that he "was in the unenviable position of trying to get adequate supplies [of oriented electrical steel] * * *." He further testified that their files were "full of the struggles" they had trying to fill quotas; that they "just never could catch up," and that he was on the "hot seat," with customers making "life very miserable." (Deposition of A. R. Edwards, President of Armco International Division.)

In view of the situation which came quickly into being, taxpayer had to decide whether to (1.) increase production in this country, (2.) commence production abroad, or (3.) authorize others to use the patents. Estimated costs of the first course of action ran from three to four hundred million dollars. The risk, as well as the cost, of production abroad was too great for taxpayer to assume.

Ultimately, although Armco was "from the very beginning extremely reluctant to license anybody abroad,[2]" the third course was determined the most advantageous, and was followed. It was, of course, in the following of this course that taxpayer entered into the agreements under which the income was received which gives rise to the issues before us.

Although the central issue in this case is whether the five transactions, or any of them, constituted "sales" as distinguished from technical aid or licensing agreements, taxpayer cannot prevail unless two other issues are also resolved affirmatively to it. They will accordingly be discussed first, and on the assumption, arguendo, that a sale had been made within the meaning of Section 1231 of the Internal Revenue Code of 1954 (26 U.S.C. § 1231).[3] No substantial issue is presented concerning the six months holding period; taxpayer established the dates of its acquisition of the patents involved and the Government makes no serious effort to suggest a shorter holding period. The Government eliminates another possible issue by making this concession in the first dozen lines of its brief.

"It is clear that in a proper case the proceeds from transactions involving patents can qualify for capital gain under the provisions of Section 1231."

2. From the deposition of Robert A. Solborg, former Armco Assistant Export Manager, "in charge of the European Theater."

3. "(a) General rule.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *

"(b) Definition of property used in the trade or business.—For purposes of this section—

"(1) General rule.—The term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, * * * which is not—* * *

"(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *."

It is further clear from abundant uncontroverted evidence in the record that oriented electrical steel cannot be made except by the use or the infringement of the taxpayer owned patents. This leaves open the question as to whether the property was "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The Government most strenuously contends that the patent rights were held primarily for such sale and a substantial portion of its testimony and of its brief are directed to this point.

In support of its contention in this regard, the Government's presentation makes a rather detailed review of Armco's operations through its subsidiary, AIC. Whereas, as already indicated, taxpayer points out that it had three alternative courses in connection with oriented electrical steel (to export and sell, to itself manufacture in other countries or to license for manufacturers), the Government adds a fourth alternative and further argues that these alternatives were not new upon the inception of oriented electrical steel but had faced Armco since its earliest days. The fourth alternative it suggests is "Do nothing," and it contends that this is the course followed by most American manufacturers of steel. The Government points out that AIC decided to negotiate license arrangements in Great Britain as early as 1913–14 concerning Armco Ingot Iron and that English, French, Italian and German agreements were entered into soon after the World War, to be followed subsequently by a Spanish agreement.

Pointing out that the continuous rolling mill was "perhaps the most significant new steel process ever developed by Armco," the Government goes into extended discussion of its policy of licensing other manufacturers to use this patented operation. After "the world's first continuous sheet rolling mill went into operation at Ashland, Kentucky, in 1924, the use of this process expanded. It was graphically described as involving a complex of 'about a quarter mile of enormous, synchronized machinery that grabs 10,000 pounds of white hot steel slab at one end of the process, squeezes it down and down, and rolls it out as a thin, wide, strip of steel at the other.' " (Government's brief.) In its 1928 annual report to its stockholders, taxpayer stated that "two well known steel companies have taken a license to manufacture under our 'continuous mill patents.' Others have it under consideration." AIC entered into an English licensing agreement of the continuous rolling mill patents around 1930. The Government outlines a similar history with reference to automotive sheet steel, stainless steel sheets, enameling iron sheets, the Sendzimir continuous galvanizing process, welded pipe and some relatively minor agreements concerning miscellaneous products and processes.

It is in effect the Government's argument that the evolutionary course of invention or development, domestic production and export, and ultimate granting of licenses for foreign manufacture of oriented electrical steel was just another in a long series of similar evolutions, and that therefore the commodity sold had been held by Armco "primarily for sale to customers in the ordinary course of [its] trade or business." In attempting to establish the five subject agreements as simply another link in a continuous chain, the Government refers repeatedly to all of the contracts, including the old ones and those here considered, as "technical aid agreements." However, to make such reference begs the basic question. Although no determination concerning the earlier arrangements is required to be here made, it seems proper to comment that an examination of those contracts (received as exhibits) discloses that it would not be unfair to characterize them as "technical aid agreements." They were not property transfers or assignments of patents and did not grant or provide to the other contracting party an exclusive commercial or legal position of freedom from competition with respect to any product or any market. This is, of

course, not true with reference to the oriented electrical steel agreements.

■ Taxpayer realized, during the three taxable years herein involved, $5,117,335 in aggregate receipts from the contracts here in issue. Standing alone this figure seems impressive, but it assumes comparative insignificance when it is pointed out AIC's overall receipts during those years amounted to over $292,000,000. In other terms, the oriented steel agreements produced only 1.74% of AIC's gross receipts for those years. This comparison indicates the insubstantial portion of AIC's business that is involved in these transactions, and indicates further that they are isolated and "separate from the mainstream of the enterprise." Recordak Corp. v. United States, 325 F.2d 460, 462, 163 Ct.Cl. 294 (1963); see also Oahu Sugar Co., Ltd. v. United States, 300 F.2d 773, 778, 156 Ct.Cl. 546 (1962), and Desilu Productions, Inc. v. Comm., TCM 1965-307, 24 TCM 1695.

■ It is also to be noted that the infrequency of the few isolated transactions also militates against a determination that they were entered into in the ordinary course of taxpayer's trade or business. See Allied Chemical Corp. v. U. S., 17 AFTR 2d 316 (S.D. N.Y. 1966).

■ The Government in its brief specifically concedes that "at the time the patents in question were first issued, they were admittedly not held for sale * * *. [I]t is clear that the taxpayer was holding them to protect [its] mo-

nopoly and intended to 'supply the oriented for the world from the United States.'" [4] The word "primarily" as it appears in the applicable subsection of Section 1231 must here be the subject of careful scrutiny, as it was recently in Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102, decided March 21, 1966. There the Supreme Court denied the Commissioner's argument and negated lower courts' holdings that the word could be read as "substantially" or "essentially." Using the word in its everyday sense as meaning "of first importance" or "principally," it is here determined that taxpayer at the time of the transactions involved was not holding the subject patents primarily for sale to customers in the ordinary course of its trade or business.[5]

■ The Government has restated what we have referred to as the basic issue in this case in the form of a question: "Did the agreements in question, insofar as each dealt with certain patents, constitute 'sales or exchanges' of such patents within the purview of Section 1231 of the 1954 Code?" In supporting its contention that this question should be answered in the negative, the Government relies to a considerable extent on the same line of argument urged in connection with the "primarily held" point. While to a certain extent there is some overlapping as to the points and arguments, it is obviously not sufficient to say, in effect, "there was no divestiture of Armco's rights in patents when it licensed others to operate under those patents on a nonexclusive basis; the

4. See E. I. Du Pont De Nemours & Co. v. United States, 288 F.2d 904 (Ct. of Claims, 1961), wherein it was held (909): "The determining factor is the purpose for which the property was held at the time of its acquisition and during its period of use; * * * and the circumstances surrounding its use and disposition."

5. See also Bauschard v. Commissioner of Internal Revenue, 279 F.2d 115, 117–118 (6th Cir. 1960); United States v. Hess, 341 F.2d 444 (10th Cir. 1965); Miller v. United States, 339 F.2d 661, 663, 168 Ct.Cl. 498 (1964); Oahu Sugar

Company v. United States, 300 F.2d 773, 156 Ct.Cl. 546 (1962); Yunker v. Commissioner of Internal Revenue, 256 F.2d 130 (6th Cir. 1958); Thomas v. Comm., 254 F.2d 233 (5th Cir. 1958); United States v. Bondurant, 245 F.2d 265 (6th Cir. 1957); Mathews v. Commissioner of Internal Revenue, 315 F.2d 101, 107 (6th Cir. 1963); and Recordak Corp. v. United States, 325 F.2d 460, 163 Ct.Cl. 294 (1963), wherein it was pointed out that "property gains classed as separate from the main-stream of the enterprise will receive more lenient treatment." (462)

oriented electrical steel agreements are merely an extension of a long line of arrangements and again, as under the earlier arrangements, no 'sale or exchange' was made." It seems almost superfluous to say that the oriented agreements must themselves be studied to determine what if anything the promisor agreed to convey or do. Whether or not, as the Government argues, it was necessary for Armco to smooth the path to its door after it had developed a better mousetrap by exporting Armco's marketing techniques and general know-how as to its many developments is quite beside the point. Many of the earlier agreements were designated "technical aid agreements," and many of the witnesses in the present case so designated them. That does not, however, justify using that phrase to describe all of taxpayer's arrangements with the overseas companies with which it did business in other matters, including those concerned with oriented electrical steel. Again, it seems little short of superfluous to mention that in making the determination on this issue the entire contract must be considered since its "essence is determined not by subtleties of draftsmanship but by their total effect." (Commissioner of Internal Revenue, v. P. G. Lake, Inc., 356 U.S. 260, 266–267, 78 S.Ct. 691, 695, 2 L.Ed.2d 743 (1958) ). Under the terms of each of the five agreements an exclusive right was conveyed by taxpayer to the respective licensees to make, use and sell in their respective countries the product produced by the patented process. As has been earlier noted, oriented electrical steel could not be made except by the use or infringement of the patents owned by taxpayer, and such infringement would have occurred had these licensees or any of them made, used or sold the oriented electrical steel. A brief review of the agreements may be helpful.

Under the Chantillon agreement it was granted the exclusive license to manufacture and sell the product of the patents in France for the full term of the patents. Under the RTB agreement it received the exclusive right to sell the product of the patents during their life in the United Kingdom. Taxpayer transferred to Cockerill under its agreement the exclusive right to manufacture, use and sell the product, during their terms, of the patents in Belgium. The Surahammars agreement gave it similar exclusive rights to manufacture, use and sell in Sweden. Again, under the Yawata agreement it became the exclusive licensee with reference to Japan and obtained the exclusive right to manufacture, use and sell the product in that country for the full term of the patents. In each instance, the rights were granted and received in accordance with the law of the appropriate country. Painstaking and thorough as is the review made of these individual agreements by the Government, the distinctions between them is not such as to require treatment here. Two points, however, merit specific reference.

The Government argues that the Cockerill, Surahammars and Yawata agreements provide that the licenses respectively granted "shall be royalty free," and that the Government is therefore entitled to judgment. We find no merit in this argument which is resolved negatively to the Government on the basis of Kavanagh v. Evans, 188 F.2d 234 (6th Cir. 1951). It is further argued that because the RTB agreement was actually with two English companies rather than one, the Government is entitled to judgment. We also find this argument to be without merit.

█ It is here concluded that each of the five contracts, considered on the basis of its specific terms and conditions read as a whole, made a conveyance of exclusive patent rights, and that such conveyance, in each instance, constituted a sale or exchange of property not held by taxpayer primarily for sale to its customers in the ordinary course of its trade or business.

Returning to the four issues as agreed upon in the Pretrial Order and hereinabove set forth, Nos. 1., 2. and 3. are resolved affirmatively to the taxpayer. No.

4. has been more cogently stated by the Government in this form: "Finally, assuming taxpayer meets its burden of proof with respect to Items 1 and 2 above, it must also show what portion, if any, of the * * * agreements are attributable directly to the patents involved in the agreement rather than to the numerous services taxpayer was obligated to perform under the agreements."

Taxpayer contends that the technical advice, instruction and assistance provided were incidental and ancillary to the transfers and conveyances, but on the basis of the present record and in the face of the arguments to the contrary presented by the Government we are not presently prepared to make a determination of this issue. Accordingly, such determination will await the conclusion of the Second Trial provided for by the terms of the Pretrial Order.

The facts and law are found and concluded as hereinabove set forth and this memorandum opinion is filed as the Court's Findings and Conclusions under the provisions of Rule 52, Federal Rules of Civil Procedure, and an entry in accordance with the foregoing may be presented.