**850**

John W. CHAMBERLIN and Marian Mc-Michael Chamberlin, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

John W. CHAMBERLIN, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Marian McMichael CHAMBERLIN, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 13020-13022.

United States Court of Appeals
Seventh Circuit.

Nov. 30, 1960.

Rehearing Denied March 20, 1961.

Harvey W. Peters, Milwaukee, Wis., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Lloyd J. Keno, Atty., Tax Division, U. S. Dept. of Justice, Lee A. Jackson, A. F. Prescott, David O. Walter, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before DUFFY, KNOCH and CASTLE, Circuit Judges.

DUFFY, Circuit Judge.

These three petitions for review involve deficiencies for personal income taxes for the years 1947, 1948 and 1949. One case involves personal income tax liability of husband and wife who filed joint returns for 1948 and 1949. The second case involves the income tax lia-

bility of the husband who filed an individual return for 1947. The third case involves the income tax liability of the wife who filed an individual tax return for 1947.

In 1933, a patent was issued to taxpayer John W. Chamberlin covering a cleansing machine he had invented. Rex Earl Bassett, Jr., was also issued a patent on certain improvements in washing machines. In 1935 Laundri-Matic Corporation received an exclusive license under the Chamberlin and Bassett patents. Chamberlin and Bassett each owned twenty-six shares of the authorized one hundred shares of capital stock of Laundri-Matic Corporation. As of July 17, 1936, the other stockholders and their holdings were Arthur A. Berard, twenty-four shares; J. C. Rowland, twelve shares and Don O. Scott, twelve shares. Sometime after February, 1935, and prior to July 17, 1936, twelve of Rowland's shares were purchased by Bassett's wife who, in turn, sold them to Scott.

On April 23, 1935, Laundri-Matic granted to Hydraulic Brake Company an exclusive, transferable license to manufacture, use and sell laundry machines covered by the Chamberlin-Bassett patents. The agreement could be cancelled by the licensee on sixty days' notice.

On July 17, 1936, Laundri-Matic assigned to Chamberlin the right to receive twenty per cent of all royalties accruing or thereafter paid to Laundri-Matic under the Hydraulic license, the payments to be made directly to Chamberlin by Hydraulic. Chamberlin acquired this right in exchange for twenty of his twenty-six shares of stock in Laundri-Matic, and by an instrument that was consented to by all of the stockholders.

On December 4, 1937, Laundri-Matic assigned to Chamberlin the right to receive an additional six per cent of the royalties payable under the Hydraulic license. This was acquired in exchange for the six shares of his stock interest in Laundri-Matic. On December 7, 1937, Chamberlin transferred the twenty-six shares of stock to Laundri-Matic. On

the same day, he assigned his six per cent interest in the royalties to his wife Marian. Laundri-Matic had few assets other than the right to receive royalty payments under the Hydraulic license. On August 10, 1936, Hydraulic assigned its right under the license to Bendix Home Appliances, Inc. and Bendix assumed Hydraulic's obligations under the license. Payments involved in the first and second issues were made by Bendix under this agreement.

On December 24, 1937, Chamberlin and Bassett formed the Chamberlin-Bassett Research Corporation (Research). Chamberlin and Bassett each owned four hundred shares of the stock in Research, and their wives each owned one hundred shares for a total of one thousand shares. Chamberlin and Bassett assigned to Research all their rights and interest in inventions and patents in the field of commercial laundry machines. Research also acquired title to patents owned by others.

In February, 1939, Research granted an exclusive license to manufacture and sell certain types of laundry machines to Borg-Warner Corporation, which agreed to pay Research a royalty for each machine sold during each year the license was in effect, with a minimum monthly royalty. The agreement provided it should remain in force until the last patent covered by it should expire unless previously terminated as provided in the agreement.

By agreement dated March 13, 1939, Research sold and assigned to Chamberlin and Bassett each a 50% interest in and to all royalties thereafter accruing or paid by Borg-Warner under the Borg-Warner license.

On December 5, 1939, Marian purchased her husband's four hundred shares of Research stock, and in June, 1940, she purchased the five hundred shares owned by Bassett and his wife, thus becoming the sole stockholder of Research.

By corporate resolution adopted June 17, 1940, Chamberlin and Marian were authorized to sell any assets of Research.

This was done during 1940 but Research was not formally dissolved. By the middle of 1941, only the "shell" of the corporation remained.

By assignment dated August 25, 1940, Chamberlin sold to Marian all rights to Research royalties which had or might thereafter accrue to him under the license agreement between Research and Borg-Warner, and whatever rights might revert to him or Research in the event the Borg-Warner license should terminate.

On February 28, 1942, Research and Marian, by letter, notified Borg-Warner of an intention to cancel the Borg-Warner license for default in payment of royalties and rendering certain statements called for by the license agreement. By letter dated March 24, 1942, Borg-Warner denied it was in default.

On April 22, 1942, Borg-Warner was notified that the license agreement was terminated. From this time until April, 1943, negotiations were conducted between Borg-Warner and the attorney for Marian, respecting the cancellation. On April 15, 1943, Marian acquired from Bassett his right to receive fifty per cent of the royalties. On April 17, 1943, the dispute with Borg-Warner was settled. Thereafter, all payments under the license were made directly to Marian.

The first issue is whether the payments received by Chamberlin from Bendix in the years 1947, 1948 and 1949 were taxable to him as ordinary income or capital gain.

Chamberlin received the payments by virtue of the agreement dated July 17, 1936, whereby Laundri-Matic assigned to him the right to receive twenty per cent of all the royalties accruing or thereafter paid by Hydraulic in exchange for twenty shares of his stock in Laundri-Matic. There is no evidence of Chamberlin's basis in the stock and no unrecovered basis is claimed by the taxpayer.

Chamberlin claims that under Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143, if the royalty interest he received in exchange for his stock in 1936 had no ascertainable value at that time, the transaction remained open; and under the doctrine of Commissioner of Internal Revenue v. Carter, 2 Cir., 170 F.2d 911 and Westover v. Smith, 9 Cir., 173 F.2d 90, the royalties received in later years are a part of the consideration for the sale or exchange of the stock and are, therefore, taxable as capital gain. However, the Commissioner argues that the rule in the Carter and Westover cases does not apply to this case unless it is clearly shown that the contract right to royalties had no ascertainable value in 1936, and that petitioners have failed to carry their burden of proving this. Rule 32, Rules of Practice, Tax Court, 26 U. S.C. (I.R.C.1954) § 7453.

In Rev.Rul. 58–402, Cum.Bull.1958–2 at 15, the Commissioner took the position that, "Contracts and claims to receive indefinite amounts, such as those received in exchange for stock in liquidation of a corporation, must be valued for Federal income tax purposes except in rare and extraordinary cases."

It is quite clear that when a taxpayer makes a gain from the sale or exchange of a claim or chose in action, this is a capital gain; while if the gain results from collection of the claim or chose in action, this is taxable as ordinary income. Osenbach v. Commissioner, 4 Cir., 198 F.2d 235.

The Tax Court was of the view that the taxpayer had the burden of proving that the exchange of stock was not a closed transaction because the contract had no ascertainable value. The Court held: "On the record before us, we are unable to make an affirmative finding that there was no ascertainable value of the contract right distributed to Chamberlin in exchange for his stock in 1936 or in 1937. There is nothing inherent in a contract or claim for the future payment of indefinite amounts that causes it to be insusceptible of valuation."

This decision to treat the payments as ordinary income rested on the fact that Chamberlin had failed to sustain his burden of proof to bring himself within

the exception to the rule established by the Burnet and Carter cases, and to overcome the presumption of correctness of the Commissioner's determination. The only evidence to support the taxpayer's claim was the contract itself. Chamberlin argues that: " \* \* \* an estimated value of contingent and uncertain contract rights will not suffice for purposes of determining taxable income, and that this type of transaction remains open until payments are actually received."

Chamberlin places his main reliance on the Burnet and Carter cases. In our view, neither of these cases supports his position. In the Burnet case, the Court did not decide that contracts for indefinite payments generally have no ascertainable value, but decided that the many uncertainties there present might prevent the return of capital. At the time there were no statutes giving capital gain treatment. In a very recent case, the Ninth Circuit had occasion to examine the Burnet case, and said: "It seems obvious this decision does not lay down any general rule which must be followed in the case at bar in any and all events." Gersten v. Commissioner, 9 Cir., 267 F.2d 195, 198. Furthermore, in the Carter and Westover cases, the parties had stipulated that the contracts had, in fact, no ascertainable fair market value.

■ The Tax Court concludes with the finding that: "We cannot conclude as a matter of either fact or law, on the basis of the terms of the license agreement alone, that the value of the right to receive a percentage of the future royalties to be paid thereunder could not have been ascertained in 1936 and 1937." We hold the Tax Court decided this issue correctly on the basis of the facts that were in evidence.

There is nothing about a contract providing for royalties from a patent which makes it impossible to value the rights received thereunder. Patents frequently have been valued for tax purposes. Henry Hudson, 39 B.T.A. 1075, 1095. In addition there is evidence that twelve shares of stock in the Laundri-Matic corporation were bought and sold within sixteen months prior to July, 1936. The sale price of the stock might very well have fairly represented the value in a proportionate interest in the sole asset of the corporation. Furthermore, there is evidence that rights to receive the Borg-Warner royalties were bought and sold throughout the years. If the parties could place a value on these royalties, they could just as easily have placed a value on the Bendix royalties. On the basis of the evidence, there is no reason to believe that some of these were not arm's length transactions.

In our opinion, the Tax Court was correct in holding the royalties received by John W. Chamberlin in the years in question must be taxed as ordinary income.

■ The second issue is whether the payments received by Marian from Bendix in each of the years involved were taxable to her as capital gain or ordinary income. The six per cent interest in the royalties was transferred by Chamberlin to his wife as a gift. All the parties agree that the payments received by Marian were taxable to her on the same basis as they would be taxed to her husband. Commissioner of Internal Revenue v. Hopkinson, 2 Cir., 126 F.2d 406. Therefore, the Tax Court was correct in holding the payments to Marian by Bendix were taxable to her as ordinary income.

The third issue is whether the payments received by Marian from Borg-Warner Corporation were taxable to her as ordinary income or capital gain. Marian attempts to create a sale or exchange of a capital asset out of the reinstatement of the agreement with Borg-Warner. In essence, her contention is that as sole owner of Research, she distributed to herself the ownership of the patent involved in liquidation of Research; that when the dispute arose she, as owner, canceled the contract, and when the dispute was settled and the contract reinstated, this was a new sale by her of the patent. Marian argues that inasmuch as she held the patent for more than six months, she was entitled

to treat the amounts thereafter received as capital gain.

The commissioner claims that Marian's right to receive the royalties was a claim or chose in action, and there being no sale or exchange thereof, the amounts received in satisfaction of the claim were ordinary income. Osenbach v. Commissioner, 4 Cir., 198 F.2d 235.

The Tax Court found first, there was no clear evidence that the patent was ever distributed to Marian, and second, the settlement of the dispute did not amount to a sale or exchange.

There is no evidence that Research actually assigned the patent to Marian or that Research was ever completely liquidated. In fact, Research was a party to both the purported cancellation and the letter of April 17, 1943, settling the dispute. In the light of the evidence, this Court cannot say the finding of the Tax Court is clearly erroneous. Wisconsin Memorial Park Co. v. Commissioner, 7 Cir., 255 F.2d 751. Without title to the patent, the agreement to reinstate the license could not qualify as a sale of a capital asset.

Marian argues that under principles of patent law, where a breach of a license agreement affects the entire consideration, the licensor has the right to rescind the contract. She says that the license was subject to a condition subsequent, the payment of royalties, and that when Borg-Warner failed to make the payments and she canceled the contract, she was reinvested with the full property rights. It appears from the evidence that the alleged breach was the failure to pay royalties and to make certain reports. Borg-Warner immediately replied that it had applied the withheld royalties against expenditures for which the licensor was liable and that the failure to make reports was only a technical violation. Marian, in effect, agreed to this when she signed the letter settling the dispute which stated: "We further agree that said license agreement is in full force and effect and that any notices of cancellation heretofore given for alleged breach of contract were premature and ineffective." The only evidence to the contrary was that Marian attempted to sell the patent rights to other parties during the dispute.

Based on this evidence, this Court cannot say the finding of the Tax Court, that there was no sale or exchange, was clearly erroneous.

Affirmed.