DawsoN, Judge: In these consolidated cases respondent determined the following Federal income tax deficiencies: [[Image here]] Pursuant to leave granted at the trial, respondent claims the following increased deficiencies: [[Image here]] The first issue for decision is whether transfers by petitioners of all their rights in certain patents constituted' a sale of either capital assets held for more than 6 months or of section 1231 assets, the gain from which is taxable to petitioners as long-term capital gain, or whether the transfers were something less than a sale, thus causing the gain to be taxable as ordinary income. A second question, raised alternatively by respondent as an affirmative issue, is whether the petitioners realized immediate gain in 1961 upon their respective sales of the patents, such gain being measured by the fair market value as of the date of sale of petitioners’ rights to receive' future payments under the sales contract, less their bases in the patents, or whether such gain is realized as payments are actually received by the petitioners. FINDINGS OF FACT Some of the facts have been stipulated by the parties. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Donald C. MacDonald (hereinafter called MacDonald) and Maud G. MacDonald are husband and wife who at the time of filing their petition herein resided in Duluth, Minn. They filed timely joint Federal income tax returns for 1961, 1962, 1963, 1964, and 1965 with the district director of internal revenue at St. Paul, Minn. They reported their income on the cash receipts and disbursements method of accounting. Zenith Dredge Co. (hereinafter called Zenith) is a corporation organized in 1905 under the laws of the State of Minnesota which during the taxable periods here involved and at the time of filing its petition herein maintained its principal office at Duluth, Minn. Zenith’s Federal corporation income tax returns for the calendar years 1961,1962, and 1963, the period January 1, 1964, to April 30,1964, and the fiscal year ended April 30, 1965, were timely filed with the district director of internal revenue at St. Paul, Minn. Zenith kept its 'books and reported its income on the accrual method of accounting. However, Zenith reported for income tax purposes the royalties received under the “Sub-License” dated May 12, 1949, and the payments received under the “Agreement of Sale” dated October 6,1961, when actually received and not when accrued during and prior to the taxable years here involved. Lloyd K. Johnson (hereinafter called Johnson) and Marion Johnson are husband and wife who at the time they filed their petition herein resided in Duluth, Minn. They filed timely j oint Federal income tax returns for 1961, 1963, 1964, and 1965 with the district director of internal revenue at St. Paul, Minn. They reported their income on the cash receipts and disbursements method. Morris J. Opsahl (hereinafter called Opsahl) and Eileen D. Opsahl are husband and wife who at the time they filed their petition herein resided in Duluth, Minn. They filed timely joint Federal income tax returns for 1961, 1962, 1963, and 1964 with the district director of internal revenue at St. Paul, Minn. They reported their income on the cash receipts and disbursements method. At all times material here, Zenith had 3,000 shares of voting common stock issued and outstanding, of which 30 shares were owned by Johnson, 30 shares were owned by Opsahl, 617 shares were owned by or for the benefit of MacDonald, and 700 shares were owned by trusts for the benefit of MacDonald’s children, 266 shares were owned by or for the benefit of MacDonald’s sister, 438 shares were owned by cousins of MacDonald, and the balance of 919 shares was owned by approximately 30 stockholders all unrelated to MacDonald, Johnson, or Opsahl. Superior Wood Products, Inc., is a corporation organized under the laws of the State of Minnesota in 1945, with its principal office located in Duluth, Minn. At all times material here, its outstanding voting common stock was owned directly or indirectly one-fourth (:%) each by Johnson, Opsahl, MacDonald, and Zenith. In 1954 by an amendment to its charter, Superior Wood Products, Inc., changed its name to Superwood Corp. (hereinafter called Superwood). Duluth-Superior Lumber Co. (hereinafter called Duluth-Superior) was a corporation organized in 1946 under the laws of the State of Minnesota, with its principal office in Duluth, Minn. At all times material here, the voting common stock and the nonvoting common stock of Duluth-Superior were owned one-fourth (*4) each by Johnson, Opsahl, MacDonald, and Zenith. Chapman Forest Utilization, Inc. (hereinafter called C.F.U.), was a corporation organized under the laws of the State of Oregon, with its principal office in Corvallis, Oreg. The principal stockholder of C.F.U. was Ealph Chapman (hereinafter called Chapman), an individual residing in Corvallis, Oreg. None of the petitioners at any time owned any stock or other interest in C.F.U. Sometime prior to August 11, 1947, Chapman developed and invented certain methods whereby wood or wood waste could be manufactured into a product known as hardboard. He also had developed and invented certain special machinery, equipment, and processes necessary and useful in the manufacture of hardboard. Hardboard itself was not a new product, but the Chapman process offered an inexpensive means of producing it. On or about August 11, 1947, Chapman entered into an agreement with Canadian Forest Products, Ltd., of Vancouver, British Columbia, whereby Chapman gave Canadian Forest Products a license to use the Chapman process in the province of British Columbia for the manufacture of hardboard of a specific gravity above .8. The license was “exclusive,” except that Chapman reserved the right, after 2 years, to make the patents and processes available to a specified British Columbia company on terms “not more favourable.” Eoyalties were dependent on production. The license was for a term of 10 years, except that Canadian Forest Products could terminate on 60 days’ notice by paying liquidated damages of $50,000. At the end of the 10-year term, Canadian Forest Products could use the process without charge, on a nonexclusive basis, for the remaining life of the patents. By an agreement dated February 25,1948, the royalty schedule was corrected and amended by the parties. No payments have been made under this agreement since 1958. Subsequent to the Canadian agreement and prior to October 18,1947, Chapman assigned to C.F.U. his entire right, title, and interest in and to any inventions and any letters patent which might issue with respect to the Chapman process. C.F.U., as assignee, acquired the following United States letters patent (hereinafter called Chapman United States patents) and Dominion of Canada letters patent (hereinafter called Cbapman Canadian patents) embodying the inventions employed in the so-called Chapman process (hereinafter collectively called Chapman patents): [[Image here]] Prior to October 18, 1947, C.F.U. granted a royalty-free license to Chapman Manufacturing Co., a partnership, to manufacture hardboard in Corvallis, Oreg., and to sell the product anywhere. On October 18, 1947, C.F.U. and Duluth-Superior entered into an agreement whereby C.F.U. would provide plans and supervision to help Duluth-Superior adapt a manufacturing plant to the Chapman process, and would train personnel to operate the plant. The agreement further provided: 4. For a period of two years from the date, Chapman agrees not to enter into any agreement with third parties for the establishing of a plant or plants for the production of “Hardboard” of a specific gravity above .8 in the following states: North Dakota, South Dakota, Nebraska, Minnesota, Iowa, Wisconsin, Illinois, Michigan and Indiana. At any time two years after production has commenced at the first plant, Chapman may enter into such agreement or agreements provided six months’ notice is first given Corporation of intention to enter into such agreement or agreements. If Corporation, within the said six months’ period, enters into an agreement with Chapman for the establishing of such plant or plants, then Chapman agrees not to contract with third parties for the establishing of such plant or plants. Provided, however, that when Corporation shall have established the following capacity in the following states to wit: North Dakota. 40 M per day South Dakota. 40 M do do Nebraska _ 40 M do do Minnesota _ 100 M do do Iowa _ 40 M do do Wisconsin 100 M do do Illinois _ 40 M do do Michigan _ 100 M do do Indiana_ 40 M do do Then and in that event, the right of the Corporation to said process, etc., shall become exclusive as to that state. PROVIDED, however, that any excess in one state can be used in computing the amount required in an adjoining state for said exclusive right. 5. That in the event Chapman obtains letter patent on any of the present type of process or machinery required or suitable for the manufacture of “Hardboard,” a license is hereby automatically extended for the use of such process or machinery by the Corporation to manufacture in North Dakota, South Dakota, Nebraska, Minnesota, Iowa, Wisconsin, Illinois, Michigan and Indiana, and, sell anywhere in the world, subject to the conditions hereinafter named, such “Hardboard.” PROVIDED, however, that said license to manufacture shall be nonexclusive except as above set forth and non-assignable, and will be for the term of the patents. On May 5, 1949, Chapman, as inventor, C.F.U., as licensor, and Duluth-Superior, as licensee, entered into a writing entitled “Agreement” which provided in pertinent part as follows: This Agreement, made and entered into this 5th day of May, 1949, by and between Ralph Chapman, hereinafter called “INVENTOR”, an individual residing in Corvallis, Oregon; Chapman Forest Utilization, Inc., an Oregon corporation hereinafter called “LICENSOR,” with offices in Corvallis, Oregon; and Duluth-Superior Lumber Company, a Minnesota corporation, hereinafter called “LICENSEE,” with offices in Duluth, Minnesota: WITNESSETH Wheeeas, Inventor has developed methods whereby wood or wood waste can be manufactured into a product called “hardboard,” and has also developed certain special machinery, equipment and processes necessary or useful in manufacturing hardboard and is working on the development of methods for improvements thereof and for the production of core board and/or other molded products; and Wheeeas, Licensor is the owner and holder of all rights in the inventions of the Inventor and/or others relating to the machinery, equipment and processes developed by the Inventor for the manufacture of hardboard; and Wheeeas, Chapman Manufacturing Company has entered into a contract with Chapman Forest Utilization, Inc. which contract permits them to manufacture hardboard at Corvallis, Oregon, and to sell their product anywhere in the world, and Wheeeas, the Licensee is desirous of entering into the the manufacture and sale of hardboard, core board and/or other molded products manufactured under the processes and methods developed ,by the Inventor either directly or indirectly through the medium of an affiliated company, Superior Wood Products, Inc., having a plant at Duluth, Minnesota, and is desirous of acquiring the services of the Inventor as supervisor of the construction, arrangement and organization of the plant of Superior Wood Products, Inc., in the initial operation, of its said plant until such time as personnel can be trained to manage and operate such plant; Now, Theeefobe, it is mutually agreed as follows: 1. The Licensor agrees to furnish qualified personnel to assist in training the initial crew at the hardboard plant of Superior Wood Products, Inc., at Duluth, and to familiarize them with the operation of said plant. All such personnel supplied by the Licensor shall remain at all times employees of the Licensor, and their compensation and/or necessary travel and living expense during the period of their service in Duluth shall be borne by the Licensor. 2. The Inventor and Licensor respectively, to the extent that either is able to do so, hereby grants to the Licensee the right to use in the manufacture of hardboard in plants located in the area which includes all states bordering on the Mississippi River and all states lying east thereof (said area being hereinafter referred to as Area 1) the methods and processes developed by the Inventor and machinery and equipment designed by the Inventor. In the event that either Inventor or Licensor applies for and/or obtains letters patent on any of the present type of process or machinery required or suitable for the manufacture of hardboard a license is hereby automatically extended for the use of such special machinery, equipment and process for the manufacture of hardboard in Area 1, such license to continue for and during the life of any such patent. 3. (a) For a period of one year from the date hereof, the Inventor and Licensor jointly and severally agree that with respect to Area 1 they will not undertake the manufacture or enter into any agreement with any person, firm, corporation or other legal entity for the manufacture of hardboard of a specific gravity above .8. (b) If on the 1st day of June, 1950, the aggregate productive capacity of the plants operated by the Licensee and/or operated under sub-licenses granted by the Licensee, have a daily productive cap'acity capable of producing a daily royalty of $50.00 per day based on royalty rate set forth in paragraph 8 herein, then the restrictions and limitations set forth in paragraph 3(a) with respect to the production of hardboard only shall continue to apply until the 1st day of June 1951. (c) If on the 1st day of June, 1951, the aggregate productive capacity of the plants operated by the Licensee and/or operated under sub-licenses granted by the Licensee, have a daily productive capacity capable of producing a daily royalty of $100.00 per day based on royalty rate set forth in paragraph 8 herein, then the restrictions and limitations set forth in paragraph 3(a) with respect to the production of hardboard only shall continue to apply until the 1st day of June 1952. (d) If on the first day of June, 1952, the aggregate productive capacity of the plants operated by the Licensee and/or operated under sub-licenses granted by the Licensee, have a daily productive capacity capable of producing a daily royalty of $150.00 per day based on royalty rate set forth in paragraph 8 herein, then the restrictions and limitations set forth in paragraph 3(a) with respect to the production of hardboard only shall continue to apply until the 1st day of June 1953. (e) If on the 1st day of June, 1953, the aggregate productive capacity of the plants operated by the Licensee and/or operated under sub-licenses granted by the Licensee, have a daily productive capacity capable or producing a daily royalty of $200.00 per day based on royalty rate set forth in paragraph 8 herein, then the restrictions and limitations set forth in paragraph 3(a) with respect to the production of hardboard only shall continue to apply until the 1st day of June, 1964. 4. In the event that the Manufacturing Company sells or transfers its existing plant at Corvallis, Oregon, to some person, firm, corporation or legal entity other than the Licensee (or a company affiliated with Licensee), then and in such event: (a) The Licensee shall be entitled to exercise the rights granted by paragraph 2 throughout the entire United States, without territorial limitations; and (b) The limitations and restrictions imposed on the Inventor and the Licensor under the several subparagraphs of paragraph 2 shall likewise apply to the entire United States, except that such, limitations and restrictions shall not prevent or forbid the new owner of such Corvallis plant from manufacturing hardboard in such plant and selling such hardboard anywhere in the world. 5. If within a period of 2 years from the date hereof, Licensee (or some company affiliated with Licensee) shall purchase or otherwise acquire the plant now being operated by the Manufacturing Company at Corvallis, Oregon, the Inventor and Licensor hereby jointly and severally grant to the Licensee the right to use, in the manufacture of hardboard in plants located anywhere within the continental boundaries of the United States, without territorial or production limitation, the methods and processes developed by the Inventor and machinery and equipment designed by the Inventor. In the event that either the Inventor or Licensor applied for and/or obtains letters patent on any of the present type of process or machinery required or suitable for the manufacture of hardboard, a license will be automatically extended for the use of such special machinery, equipment or process for the manufacture of such hardboard, which right shall be exclusive with the Licensee and such license shall continue for and during the life of any such patent, and neither the Inventor nor the Licensor shall engage directly in the manufacture of hardboard of a specific gravity above .8 or enter into any agreement with any person, firm, corporation or other legal entity other than the Licensee, for the establishment of a plant or plants for the manufacture of any such hardboard in any state within the continental United States. 6. The Licensee shall be privileged to grant a sublicense to Superior Wood Products, Inc. covering all or any part of the manufacturing and selling rights herein and hereby granted to the Licensee and upon written notice to the Licensor may grant additional sub-licenses covering all or any part of the manufacturing and selling rights to any affiliated company. But except in the case of the rights previously granted to the Superior Wood Products, Inc. or subsequently granted by sub-license to any other affiliated company the manufacturing rights herein granted to the Licensee shall not be assignable in whole or in part to any person, firm, corporation or other legal entity without the prior written consent of the Licensor. No assignment however, except with the consent of the Licensor, shall relieve the Licensee from the duties and obligations otherwise imposed by this agreement. The term “affiliated company” whenever used in this agreement, shall be understood to mean any corporation of which a majority of the capital stock is owned by the persons presently owning a majority of the capital stock of the Licensee. 7. The Licensor and the Inventor respectively grant to the Licensee the right to sell all hardboard manufactured pursuant to the rights herein before granted to the Licensee, anywhere in the world without territorial limitation of any kind, at such prices, upon such terms and in accordance with whatever type of selling arrangements may seem to the Licensee suitable or desirable, and without limiting the generality of this provision, the Licensee may sell such hardboard directly through its own organization, or may enter into a contract or contracts with others for the sale of such hardboard. 8. Dor a period of 15 years after production has commenced at the first plant, the Licensee shall pay to the Licensor as royalties for any hardboard products manufactured by the Licensee directly or through affiliated companies operating under sub-licenses granted by the Licensee as previously provided, irrespective of the process or equipment used the following sums per 1,000 square feet surface measure: One Dollar ($1.00) for board of 7/32” thickness or thicker. Eighty-five cents ($0.85) for board of 5/32” to 7/32” thickness. Seventy-five cents ($0.75) for board less than 5/32” thickness. Alter the expiration of such 15 year period, no further royalty shall be required. 9. This contract is to supersede in full the contract made between the Licensor and Licensee dated October 18, 1947, except as to the obligations imposed upon the Licensor in paragraph 1 of said contract [concerning the furnishing of plans and supervision]. On May 12, 1949, Duluth-Superior and Superior Wood Products, Inc. (Superwood), entered into a “Sub-License” which provided in pertinent part as follows: SUB-LICENSE This Agreement, made and entered into this 12th day of May, 1949, by and between THE DULUTH-SUPERIOR LUMBER COMPANY, a Minnesota corporation, hereinafter called “Duluth”, and SUPERIOR WOOD PRODUCTS, INC., a Minnesota corporation, hereinafter called “Superior”. WITNESSETH: Whereas, on the 5th day of May, 1949, an agreement was entered into by and between Ralph Chapman, an individual residing at Corvallis, Oregon, Chapman Forest Utilization, Inc., an Oregon corporation, and The Duluth-Superior Lumber Company, a Minnesota corporation, a copy of which agreement is attached hereto and made a part hereof by reference, And Whereas, Superior is desirous of operating the plant which it has in Duluth, Minnesota, under a sub-license from Duluth as permitted in the contract hereto attached, Now Therefore, it is mutually agreed as follows: 1. Duluth does hereby license Superior to operate said hardboard plant at but only at or adjoining Superior’s plant in Duluth as fully and completely as Duluth itself would be permitted under the contract attached hereto and specifically grants to Superior the right to sell all hardboard manufactured pursuant to the rights herein granted anywhere in the world without territorial limitations of any kind upon such terms and in accordance with whatever type of selling arrangements may seem to Superior suitable or desirable, and without limiting the generality of this provision, Superior may sell such hardboard directly through its own organization or may enter into a contract or contracts with others for the sale of such hardboard. 2. Eor a period of twenty-five (25) years after production has commenced at Superior’s plant, Superior shall pay to Duluth as royalties for any hardboard manufactured by Superior, irrespective of the process or equipment used, the following sums per 1,000 square feet surface measure: Five Dollars ($5.00) for board of thickness or thicker. Four and 25/100 Dollars ($4.25) for board of %2" to %2" thickness. Three and 75/100 Dollars ($3.75) for board less than %2'' thickness. After the expiration of such twenty-five (25) year period, no further royalty shall be required. Provided, however, that until Superior shall be in profitable operation and until two (2) months after notice of intention to increase royalties given by Duluth to Superior, the royalty shall be as follows for each 1,000 square feet surface measure: One dollar ($1.00) for board of %?" thickness or thicker. Eighty-five cents ($0.85) for board of %2" to %2" thickness. Seventy-five cents ($0.75) for board less than %2" thickness. ♦*♦**♦* 5. That Superior will not sell, lease, or otherwise dispose of the equipment contemplated hereunder for -the production of hardboard separate and apart from the obligations of this contract, and that Superior will hold in confidence insofar as practical all of the information and knowledge obtained by it either through this contract or through the contract attached hereto. On or about June 15, 1951, Duluth-Superior was dissolved, and Johnson, Opsahl, MacDonald, and Zenith, as shareholders of Duluth-Superior, each thereby acquired a one-fourth interest in and to Duluth-Superior’s interest in the agreement dated May 5,1949, and in the sub-license dated May 12,1949. On December 13, 1960, MacDonald, Johnson, Opsahl, and Zenith, and Superwood entered into an “Amendment to Sub-License” which provides as follows: Whereas, on the 12th day of May, 1949, The Duluth-Superior Lumber Company and Superior Wood Products, Inc., entered into a Sub-License Agreement licensing Superwood to manufacture and sell hardboard in consideration of the payment of royalties therefor, a copy of which Sub-License is attached hereto as Exhibit “A”; and Whereas, The Duluth-Superior Lumber Company was dissolved and its rights are now owned by the Duluth Group; and Whereas, the Internal Revenue Service has audited the income tax returns of Superwood for the years 1954,1955, 1956, 1957 and 1958, and has claimed the royalties paid by Superwood to the Duluth Group are excessive and constitute dividends; and Whereas, the parties hereto orally agreed on or about January 1, 1960, that if in the pending tax proceedings said royalties were settled by an adjustment of the allowable royalties, the parties hereto would make a similar adjustment of the royalties to be accrued after January 1, I960;' and Whereas, in said tax proceedings the royalties paid to the Duluth Group have now been settled by allowing eighty percent (80%) ‘thereof to be reasonable royalties; and Whereas, the parties hereto desire to formalize their agreement reducing said royalties; Now, Therefore, it is hereby agreed that commencing January 1, 1960, the royalties to be thereafter paid pursuant to paragraph 2 of the Agreement dated May 12, 1949, attached hereto as Exhibit “A” shall be as follows: Pour Dollars ($4.00) for board of 7/32" thickness or thicker. Three and 40/100 Dollars ($3.40) for board of 5/32" to 7/32" thickness. Three Dollars ($3.00) for board less than 5/32" thickness. On January 31,1961, C.F.U. and Opsahl, Johnson, MacDonald, and Zenith entered into a “Cancellation Agreement” dated January 31, 1961, which provided that the agreement dated May 5,1949, was thereby canceled. On January 31,1961, C.F.U. and Opsahl, Johnson, MacDonald, and Zenith executed and delivered an “Agreement” dated January 31, 1961, which provided as follows: This Agreement, made and entered into this 31st day of January, 1961, by and between CHAPMAN FOREST UTILIZATION, INC., an Oregon corporation, hereinafter called “C.F.U.”, and MORRIS J. OPSAHL, LLOYD K. JOHNSON, DONALD O. MacDONALD and ZENITH DREDGE COMPANY, a Minnesota corporation, hereinafter collectively called “Purchaser”. WITNESSETH Whereas, C.E.U. is the owner of certain patents which are described in detail in Exhibit “A” attached hereto and by reference made a part hereof as though fully set forth herein; and Whereas, C.E.U. has adopted a Plan of Liquidation under which said patents are to be sold by C.E.U. and purchased by Purchaser, such Plan having been adopted on the 24th day of January, 1961. Now, Therefore, for and in consideration of the covenants and promises herein contained, it is agreed as follows: 1. That C.E.U. hereby sells, assigns, transfers and set over unto Purchaser all its right, title and interest in and to the patents listed on Exhibit “A” attached hereto, C.E.U. agreeing to execute and deliver necessary instruments of transfer thereof to Purchaser contemporaneously with the execution hereof. 2. That Purchaser hereby jointly and severally agrees to pay to C.E.U. the sum of Two Hundred Eifty Thousand Dollars ($250,000.00) together with interest on the deferred balance at four percent (4%) per annum, which interest Purchaser also agrees to pay, which payments are to be made Sixteen Thousand Dollars ($16,000.00) on the execution hereof, receipt whereof is hereby acknowledged, Sixteen Thousand Dollars ($16,000.00) on April 1, 1961, July 1,1961, and October 1,1961, and Twelve Thousand Dollars ($12,000.00) quarterly thereafter commencing with January 1,1962, until all sums, principal and accrued interest, have been paid in full. All such payments hereunder shall be applied first against accrued interest and then against principal. The balance due hereunder may be prepaid in full or in part at any time or times without penalty. In the event of default in any such payment the entire balance due hereunder shall be immediately due, payable and collectible on the expiration of thirty (30) days after the giving of written notice by C.E.U. to Purchaser, and each of them, such notice to be mailed, postage prepaid, to the addresses shown on Exhibit “B” attached hereto and by reference made a part hereof. 3. That payments shall be made to C.E.U. at Corvallis, Oregon, until such time as C.F.U. is dissolved. That on any dissolution of C.F.U. Purchaser agrees to make payments of the sums due hereunder in the proportions and to the parties entitled thereto, all in accordance with written instructions given by C.E.U. to Purchaser. 4. That time is of the essence hereof. 5. That in the event of suit, action or proceeding brought hereunder the prevailing party shall be entitled to a reasonable attorney’s fee therein. 6. That this agreement shall be interpreted according to the laws of the State of Oregon. 7. That this agreement shall be 'binding on, and shall enure to the benefit of the heirs, personal representatives, successors and assigns of the parties hereto. Attached to the agreement of January 31, 1961, was a list of the Chapman patents as described above. On February 14, 1961, C.F.TJ. executed and delivered to Opsahl, Johnson, MacDonald, and Zenith (“Assignees”) an “Assignment of Patents” whereby C.F.TT. assigned to the assignees, their legal representatives, successors, and assigns, all its interest in the Chapman TJ.S. patents. This assignment of patents was not filed for record in the U. S. Patent Office. On February 14, 1961, C.F.U. executed and delivered to Opsahl, Johnson, MacDonald, and Zenith (“Assignees”) an “Assignment of Patents” dated February 14, 1961, whereby C.F.TJ. assigned to the assignees, their legal representatives, successors and assigns, all its interest in the Chapman Canadian patents. This assignment was not filed for record in the Canadian Patent Office. Opsahl, Johnson, MacDonald, and Zenith have each paid to C.F.U., or its successors in interest, the total principal sum of $62,500, plus interest thereon, pursuant to the terms of the agreement dated January 31,1961. On October 6,1961, Opsahl, Johnson, MacDonald, and Zenith, and Superwood executed and delivered an “Agreement of Sale” dated October 6,1961, which provided as follows: This Agreement, made and entered into this 6th day of October 1961, by and between MORRIS J. OPSAHL, LLOYD K. JOHNSON, DONALD 0. MacDONALD and ZENITH DREDGE COMPANY, a Minnesota corporation, hereinafter collectively called “Sellers” and SUPERWOOD CORPORATION, a Minnesota corporation, hereinafter called “PURCHASER”, WITNESSETH Whereas, Sellers are the owners of certain patents relating to the manufacture of hardboard, described in detail in Exhibit A attached hereto and by reference made a part of this agreement; and Whereas, Purchaser has heretofore been licensed by Sellers’ predecessor in interest under agreement dated May 12, 1949, wherein Purchaser was licensed to manufacture hardboard at and only at Duluth, Minnesota, upon the payment of royalties upon production of hardboard; and Whereas, as of January 1, 1960, Purchaser and Sellers modified said license agreement to reduce the royalty requirements to conform to the determination made by Internal Revenue Service as to the reasonableness of said royalties paid by Purchaser for the years 1954 to 1958, inclusive; and Whereas, Purchasers under said license agreement is required to pay royalties to Sellers on all production of hardboard at Duluth until 1975, and is otherwise restricted as to possible expansion to manufacture in areas other than Duluth; and Whereas, Purchaser wishes to purchase said patents, eliminate royalty payments and otherwise free itself from any restrictions from manufacturing in areas other than Duluth; Now Therefore, the parties agree as follows: 1. Sellers hereby sell, assign, transfer and set over unto Purchaser all their right, title and interest in and to the patents listed on Exhibit A attached hereto, and Sellers agree to execute and deliver the necessary instruments of transfer thereof to Purchaser in form suitable for recording in the appropriate patent offices. 2. Purchaser hereby agrees to pay to Sellers for and as the purchase price thereof a sum equal to an amount computed as follows: On all hardboard having a specific gravity above .8, manufactured in the United States or Canada by or under license from purchaser, from the date hereof to and including May 31, 1970, irrespective of the process or equipment used: $4.00 for each 1,000 square feet surface measure of hardboard of 7/32" thickness or thicker; $3.40 for each 1,000 square feet surface measure of hardboard of 5/32" to 7/32" thickness; $3.00 for each 1,000 square feet surface measure of hardboard less than 5/32" in thickness. 3. Payments on purchase price shall be made in monthly installments, payable on or before the 15th day of each month commencing on the 15th d'ay of November, 1961. The amount of said payments shall be computed on the basis of hardboard manufactured during the preceding calendar month. 4. Time is of the essence of this agreement. 5. This agreement shall be interpreted according to the law of the State of Minnesota. 6. This agreement shall be binding on, and shall inure to the benefit of, the heirs, personal representatives, successors and assigns of the parties hereto. On January 3,1962, Opsahl, as trustee, and Little Nock Hardboard, Inc., and James Kohler entered into an “Agreement” dated January 3, 1962, and pursuant to the agreement, Superwood acquired and has at all times since held all of the stock of Little Nock Hardboard, Inc. The payments made by Superwood and Little Nock Hardboard, Inc., to Opsahl, MacDonald, Johnson, and Zenith, as provided for under the terms of paragraph 2 of the sublicense dated May 12,1949, as amended, for the years 1950 to October 6, 1961, inclusive, and as provided for under the terms of paragraph 2 of the agreement of sale dated October 6,1961, for the period October 6,1961, to June 15,1970, inclusive, are as follows: [[Image here]] Opsahl, Johnson, MacDonald, and Zenith each received royalties from Snperwood under the sublicense dated May 12, 1949, as amended, during the period from January 31,1961, through October 6,1961, in the total amount of $63,'394.69. In their respective 1961 Federal income tax returns, the petitioners each reported the royalties received from Superwood during the period January 31,1961, to October 6,1961, as follows: Boyalties received Amortization of patents Ordinary income $63, 394. 69 $3, 935. 34 $59, 459. 35 The amount reported by each petitioner as the amortization of their respective bases in the Chapman patents of $62,500 was computed on the straight-line method by using the expiration date of the last of the Chapman patents to expire (December 7,1971) as the terminal date of the useful life of the patents over the period from January 31, 1961, to October 6, 1961. The unamortized basis in the patents in the hands of each of the petitioners as of October 6, 1961, was $58,564.66. In their respective 1961 Federal income tax returns, petitioners each reported the transaction involved in the agreement of sale dated October 6,1961, as the sale of a capital asset (the Chapman patents) held for more than 6 months, and specifically elected to report the gain from the sale on the installment method, as follows: Payments received Amortization of patents Long-term capital gain $11, 983. 56 $863. 83 $11, 119. 73 The amount reported by each petitioner as the amortization of their respective bases in the patents of $58,564.66 was computed by using the expiration date of the last of the Chapman patents to expire (December 7,1971) as the terminal date of the useful life of the patents over the period from October 6, 1961, to December 31, 1961. Despondent allowed each petitioner to amortize his respective bases in the patents over the period October 6,1961, to May 31, 1970 (the last date under the agreement of sale for which payments would accrue). During the taxable years involved herein the petitioners received the following payments from Superwood under the agreement of sale dated October 6,1961: [[Image here]] The amortization of each petitioner’s basis in the Chapman patents as allowed in the notice of deficiency with respect to the payments received from Superwood under the agreement of sale dated October 6, 1961, during the taxable years involved herein as follows: [[Image here]] Commencing in 1951 and continuing through May 31, 1970, hardboard produced by Superwood was employed in the auto industry by various fabricators. The approximate percentage of such use to production is set forth below: Year Percentage 1950 _ 0. 0 1951_ 1. 32 1952 _10.35 1953 _31. 77 1954 _36.12 1955 _40. 60 1956 _46. 66 1957 _46.16 1958 _31.91 1959 _47. 00 1960 _40. 78 Year Percentage 1961_32. 99 1962 _36. 67 1963 _34.17 1964 _26. 66 1965 _30. 05 1966 _28.25 1967 _28. 84 1968 _35.11 1969 _33.01 Jan. 1 to May 31, 1970 _29. 60 Neither Superwood nor Little Nock Hardboard, Inc., has produced any hardboard in Canada and petitioners have not received any payments under the agreement of sale dated October 6,1961, by reason of any production covered by the Chapman Canadian patents. As stated above, prior to May 5, 1949, C.F.U. had entered into a contract with Chapman Manufacturing Co., a partnership consisting of Ralph Chapman and others, which contract was referred to in the agreement dated May 5, 1949, and which contract licensed Chapman Manufacturing Co. to manufacture hardboard at its plant located in Corvallis, Oreg., and to sell hardboard anywhere in the world, royalty-free of present or future patents obtained by C.F.TJ. or Chapman. On June 14,1951, the plant located at Corvallis, Oreg., was purchased by certain persons (hereinafter called John D. Nelson, et al.). On June 14, 1951, C.F.U. and Chapman granted a “License” dated June 14, 1951, to John D. Nelson, et ah, which provided as follows: Whereas, the persons listed on “B” attached hereto are purchasing the real property described on “A” attached hereto together with the plant and equipment thereon which are used to manufacture “hardboard” under the Chapman process (“hardboard” being board of a density of .8 or greater), and as a part of the consideration therefor, and for a consideration of the sum of $1.00 cash in hand paid to the undersigned Chapman Forest Utilization, Inc., and Ralph Chapman personally, the following agreement is made; Now Thebefobe, in consideration of the purchase of the real property described in “A” attached hereto, and by reference made a part hereof, and in further consideration of the sum of $1.00 cash in hand paid to the undersigned, receipt whereof is hereby acknowledged, the undersigned and each of them, hereby perpetually and irrevocably license and empower the purchasers of said real property whose names appear on “B” attached hereto and by reference made a part hereof, and their successors in interest to said real property, to manufacture on the said real property, and to sell anywhere in the world, “hardboard” as herein defined under the Chapman process, it being the intention hereby to license and empower the said named persons, and those who succeed to ownership and/or lawful occupancy of the said premises, to manufacture “hardboard” royalty free of present or future patents obtained by the undersigned, or either of them. This license may not be assigned in whole or in parlt separate and apart from the lawful ownership or occupation of the said real property. The license superseded and replaced the prior contract between C.F.TJ- and Chapman Manufacturing Co. The real property described in the license is the property upon which the plant at Corvallis, Oreg., is located. The real estate and the license were subsequently assigned by John D. Nelson, et al., to Chapman Manufacturing Co., Inc., a Washington corporation (hereinafter called Manufacturing, Inc.). On March 14,1956, Manufacturing, Inc., assigned the license to Chapman Manufacturing Co., an Oregon corporation (hereinafter called Manufacturing Co.). On July 81, 1958, Evans Products Co., a Delaware corporation (hereinafter called Evans Products), acquired the real property upon which the plant at Corvallis, Oreg., is located, and the license dated June 14,1951, by assignment from its wholly owned subsidiary Manufacturing Co. The license was in existence on January 31, .1961, and on October 6, 1961, and during all the taxable years involved herein. On or about November 1965, Evans Products abandoned the use of the process covered by said license. None of the petitioners had any stock or other interest in Manufacturing, Inc., in Manufacturing Co., in John D. Nelson, et al., or in Evans Products. At all times during the years involved herein, and for many years prior thereto, MacDonald has been an officer of Zenith, and he has not been engaged in any other significant trade or business. At all times during the years involved herein, and for many years prior thereto, Opsahl has been an officer of Superwood, and he has not been engaged in any other trade or business. At all times during the years involved herein, Johnson has been a lawyer engaged in the practice of law, and he and his wife have been engaged in various other trades or businesses including the Ameriply Veneer Co., the High Falls Gift Shop, the Trading Post Gift Shop, Arrow-Head Plastics, iron ore and other mineral exploration and development, and timber sales. At all times during the years involved herein, Zenith has been principally engaged in the businesses of dredging, pile driving and dock construction, and related activities. MacDonald, Opsahl, Johnson, and Zenith have never had any interests in any patents, patent applications, or inventions other than those described herein except that (1) Johnson acquired in about 1959 an interest in a medical patent pertaining to an immobilizer as one of the assets of Arrow-Head Plastics, which interest in the said medical patent he still owns and uses in connection with said business; and (2) Opsahl and Johnson each received an interest in a business venture known as the Organic Fertilizer Project during calendar years 1964 and 1965 and thereby each acquired an undivided interest in a patent for the production of fertilizer and that Opsahl and Johnson each subsequently abandoned their interest in such business venture and their interest in said patent. During the entire period that MacDonald, Opsahl, Johnson, and Zenith held their interest in the Chapman patents, each held the Chapman patents for the production of income and not for sale to customers in the ordinary course of their respective trades or businesses. OPINION This case arises out of a series of transfers of various rights in a group of patents. Ealph Chapman invented a process for the inexpensive manufacture of hardboard, and secured United States and Canadian patents for the process. Chapman granted a license to Canadian Forest Products Ltd. to use the patented process for the production of hardboard in British Columbia. He then assigned all his interest in the United States patents and all his remaining interest in the Canadian patents to C.F.U., a corporation controlled by him. C.F.U. granted a royalty-free license to Chapman Manufacturing, a partnership, to use the process to manufacture hardboard at its plant in Corvallis, Oreg., and to sell the product anywhere. This license was assignable with the plant. C.F.U. then granted a license to Duluth-Superior (a corporation owned equally by the petitioners) to use the process in certain midwestern States. Duluth-Superior granted a sublicense to Superwood, another corporation owned equally by the petitioners. Superwood received the right to produce hardboard at its Duluth, Minn., plant at a royalty five times as great as that paid by Duluth-Superior to C.F.U. In June 1951, Duluth-Superior was dissolved, with the license from C.F.U. and the sublicense to Superwood passing into the hands of the petitioners. Also in June 1951, Chapman Manufacturing Co. sold its plant in Corvallis, Oreg. The nonexclusive license which Chapman Manufacturing had held passed to the purchasers of the plant. By the terms of the license agreement between C.F.U. and Duluth-Superior, upon the sale of the Corvallis plant by Chapman Manufacturing, the territorial restrictions in the Duluth-Superior’s license lapsed. However, Superwood was still restricted to producing at its Duluth plant. About 10 years later, in January 1961, C.F.U. transferred all of its interest in the patents to the petitioners for the sum of $250,000. Shortly thereafter, in October 1961, petitioners transferred all of their interest in the patents to Superwood. The result of this final transaction was that Superwood held the United States patents, subject only to the royalty-free license which C.F.U. had granted to the owners of the Corvallis, Oreg., plant (which had changed hands). Superwood also held the Canadian patents subject only to the British Columbia license held by Canadian Forest Products. In his opening statement, respondent’s counsel indicated that he might attack the transfer from petitioners to Superwood as a sham transaction. However, on brief, respondent appears to have abandoned this argument, saying: “Bespondent does not deny that said petitioners transferred to Superwood on October 6, 1961, their respective interests in said patents received from C.F.U. on January 31,1961.” Bespondent’s primary position is that petitioners may treat the amounts received from Superwood as capital gains only if there was a sale of the patents; and that there was a sale of the patents only if all substantial rights in the patents were transferred by the petitioners. To the contrary, petitioners’ position is that they sold 100 percent of whatever they received from C.F.U., and that if it was not an inventory item, then they may treat the transaction as the sale of capital or section 1231 assets. We agree with the petitioners. While acknowledging that petitioners are not “holders” of patents within the scope of section 1235, respondent nevertheless contends that the regulations under section 1235 should apply “by analogy.” Specifically, respondent refers to section 1.1235-2 (b) (1), Income Tax Begs.: (b) All substantial rights to a 'patent. (1) The term “all substantial rights to a patent” means all rights (whether or not then held by the grantor) which are of value at the time the rights to the patent (or an undivided interest therein) are transferred. The term “all substantial rights to a patent” does not include a grant of rights to a patent— (i) Which is limited geographically within the country of issuance; (ii) Which is limited in duration by the terms of the agreement to a period less than the remaining life of the patent ; (iii) Which grants rights to the grantee, in fields of use within trades or industries, which are less than all the rights covered by the patent, which exist and have value at the time of the grant; or (iv) Which grants to the grantee less than all the claims or inventions covered by the patent which exist and have value at the time of the grant. The circumstances of the whole transaction, rather than the particular terminology used in the instrument of transfer, shall be considered in determining whether or not all substantial rights to a patent are transferred in a transaction. We note that subdivisions (i) and (iii) of that regulation have been held invalid by this Court. See Vincent B. Rodgers, 51 T.C. 927 (1969); Thomas L. Fawick, 52 T.C. 104 (1969), revd. 436 F.2d 655 (C.A. 6, 1971).[2] In the Rodgers opinion we said: By its use of the phrase “property consisting of all substantial rights to a patent,” we do not think Congress intended to import into section 1235 any further or different impediments to capital gains treatment than were contained in section 117 of the 1939 Code. * * * That language throws at least some doubt on the first sentence of the regulation as well. Until the regulations under section 1235 confused the area, it was understood that to ask whether there was a transfer of “all substantial rights” was to ask if there had been a sale of the patent. See Vincent B. Rodgers, supra at 929, fn. 2; Fawick v. Commissioner, supra; 3B Mertens, Law of Federal Income Taxation, sec. 22.133 (1970 Supp.). In patent law the sale of a patent is commonly accomplished by granting an exclusive license for the life of the patent. It is sometimes difficult to distinguish sales from licenses. The issue of whether all substantial rights have been transferred (that is, whether there has been a sale) should arise only when the transferor has retained rights of some sort. In fact, most of the cases seem to be of this type. See cases cited in Mertens, supra. However, respondent has convinced one court that 'under section 1235, “all substantial rights” refers to 100 percent of the original patent rights and that a transfer of all remaining rights (taxpayer had granted a prior nonexclusive license) would not qualify for capital gains. First National Trust & Savings Bank of San Diego v. United States, 200 F. Supp. 274 (S.D. Cal. 1961). But we think the better view is that the transfer of all remaining rights in a patent is a sale entitled to capital gains treatment if it meets the provisions of section 1221 or 1231. Bell Intercontinental Corp. v. United States, 381 F. 2d 1004 (Ct. Cl. 1967).[3] In any event, petitioners in this case transferred 100 percent of any patent rights which they ever held. This property was not held primarily for sale to customers; and it was held for more than 6 months. We conclude that the sale of it qualifies for capital gains treatment under section 1231 or 1221. Cf. C. A. Norgren Co. v. United States, 268 F. Supp. 816 (D. Colo. 1967); Armco Steel Corp. v. United States, 263 F. Supp. 749 (S.D. Ohio 1966). Bespondent’s alternative position is that the obligation from Su-perwood to petitioners in the agreement of sale had an ascertainable fair market value, and that to the extent of such fair market value the petitioners received income in the year of sale. With respect to this issue, which was raised by amended answers and which involves increased deficiencies for 1961, respondent bears the 'burden of proof. Buie 32, Tax Court Buies of Practice; Kimbell-Diamond Milling Co., 10 T.C. 7 (1948); Beck Chemical Equipment Corp., 27 T.C. 840 (1957). Petitioners, who reported the transaction as an installment sale, argue (1) that the obligation had no ascertainable fair market value, (2) if it had an ascertainable fair market value, the petitioners, who use the cash method of accounting, received income only when the payments were received, and (3) if the obligation had a fair market value, the initial payments were less than 30 percent of that amount, so that the transaction qualified as an installment sale. “There is nothing inherent in contract or claim for the future payment of indefinite amounts that causes it to be insusceptible of valuation.” John W. Chamberlin, 32 T.C. 1098, 1106 (1959), affd. 286 F. 2d 850 (C.A. 7, 1960). “The fair market value of property is a question of fact, but only in rare and extraordinary cases will property be considered to have no fair market value.” Sec. 1.1001-1 (a), Income Tax Kegs. Although in patent cases taxpayers are very often able to establish that production-type payment agreements are not susceptible of valuation, the courts have found valuations where taxpayers have failed to carry that burden, Slater v. Commissioner, 356 F. 2d 668 (C.A. 10, 1966); Chamberlin v. Commissioner, supra, or where the history of payments provides sufficient facts to establish a value. Marsack's Estate v. Commissioner, 288 F. 2d 533: (C.A. 7, 1961). See also Stephen H. Dorsey, 49 T.C. 606, 630-631 (1968), where this Court recognized the usefulness of “experience” in an “established industry” in providing “criteria for ascertaining fair market value.” Noting that the hardboard industry predated the Chapman process for producing hardboard, and relying on the fairly stable rate of growth in the payments by Superwood under the sublicense, respondent argues that there is sufficient experience and history present in this case to ascertain the fair market value of the patents. At first glance respondent’s contention seems appealing, but it loses its force when the facts contained in this record are carefully considered. First, the agreement of October 6,1961, did not simply convert a license into a sale, upon the same terms. Although the production-payment schedule remained the same, all limitations on production were removed. Under the sublicense Superwood was authorized to produce only at its Duluth plant. After acquiring the patents, Super-wood could produce anywhere. Presumably the ability to produce in new geographic areas carried with it the possibilities of expanding markets. At least respondent has not shown otherwise. Thus the history of production and payments by the Duluth plant under a limited sublicense, without more facts, gives no indication of production possibilities on a national scale. While the history of the Duluth plant may provide a method of determining some minimum value for the patents, it would not be the fair market value. And if, as respondent contends, receipts in excess of this ascertained value are reportable as ordinary income (he relies on Osenbach v. Commissioner, 198 F.2d 235 (C.A. 4, 1952)), it would be inappropriate for us to assign to the patents a minimum value which, is likely to be less than fair market value. Certainly we would not be justified in closing the transaction simply because we believed the fair market value to be at least $1. In fact the Duluth plant did not continue to be the sole production site for Superwood. In 1962 it acquired the stock of Little Nock Hardboard, Inc., and by 1969, Little Nock Hardboard accounted for production payments of $195,000, compared to payments of $500,000 by Superwood. Nespondent also points out that 8 months before the transfer in question, petitioners purchased the identical property for $250,000 from C.F.U. Hence respondent argues: (1) That $250,000 represented the lump-sum value of petitioners’ obligation to pay C.F.U. royalties of X dollars per square foot of hardboard produced; (2) that Superwood is obligated under the terms of the sale to pay 4X dollars per square foot of hardboard produced; and (8) thus the value of Superwood’s obligation must be at least $1 million. We think respondent’s approach is too simple. First, under their license petitioners were obligated to pay royalties until about May 1965, when their license expired. Consequently, in purchasing the patents they acquired not only a release from their royalty obligations, but also the right to use the process from 1965 until the patents expired, in 1968 through 1971. Second, by the terms of sale Superwood is obligated to pay until May 31, 1970. Thus the periods of payment are not of comparable length, nor are the total amounts to be paid comparable. Third, petitioners had a license of national scope, extending for less than the life of the patents. Superwood had a sublicense limited in territory to Duluth, but with payments extending into 1975. Although petitioners and Superwood each held identical interests after their purchases, they held different interests at the start of negotiations, so that they paid for different bundles of additional rights. The price paid by one does not show the value of what the other received, nor does the price paid by either necessarily reflect the value of the whole bundle of patent rights. Finally, some courts have expressed concern as to whether the value of one side of an exchange is necessarily determinative of the value of the other side of the exchange. See Seas Shipping Co. v. Commissioner, 371 F.2d 528, 529-530 (C.A. 2, 1967); Philadelphia Park Amusement Co. v. United States, 126 F. Supp. 184 (Ct. Cl. 1954). Here respondent weds the risks of barter-equation valuation with those of extrapolation. Nespondent’s witnesses evaluated the agreement of sale by extrapolating from the history of payments by Superwood’s Duluth plant. They did not take into account the possibility of new plants and expanded markets. Nor did they place any emphasis on the threats of production lost by strikes, fires, or other problems. We think that to a company producing at one or two plants, and selling 80 to 40 percent of its production to automobile manufacturers, such risks are substantial. It would be difficult to shift or to make up lost production. And where the patents will eventually expire, production must be made up within a limited period of time or be lost in part to competition. In short, we think the history of payments from the Duluth plant and the prior purchase from C.F.U. provide insufficient facts for ascertaining the fair market value of the obligation of Superwood. The issue is one of fact. Marsack's Estate v. Commissioner, supra. Based on the facts before us, the case is one where it is appropriate that “the liability for income tax ultimately * * * be fairly determined without resort to mere estimates, assumptions, and speculation.” Burnet v. Logan, 283 U.S. 404, 412 (1931). Under these particular circumstances we conclude that respondent has failed to sustain his burden of proving that the contract in question had an ascertainable fair market value in 1961. Since it had no ascertainable fair market value, “the transaction was not a closed one” in that year. Burnet v. Logan, supra at 413. In view of this conclusion, it is unnecessary for us to decide whether the installment sale provisions may be used where there is no fixed contract price. It is also unnecessary for us to determine whether fair market value and equivalent to cash are interchangeable terms. Decisions will he entered wnder Bule SO. The Issue In Fawich Is not before us here, for petitioners in this case retained no rights in the patents whatsoever, beyond the right to be paid for them. But in view of the apparent, indeed gratuitous, damage done to Rodgers by the Court of Appeals, and to our position that a patent is divisible at least in some ways, we think it appropriate to discuss the Fawich ease. We think the opinion of the Court of Appeals is consistent with our view that “transfer of all substantial rights in the patent” is equivalent to “sale of the patent.” The issue in Fawick and Rodgers was whether there may be a sale of parts of a patent, and what shapes the parts may take. In Rodgers we held that a patent is divisible and salable geographically. In Fawich we held that it was divisible and salable by fields of use. In deciding Rodgers, we thought it was well-established that a patent could be divided into geographic parts. Waterman v. MacKenzie, 138 U.S. 252, 255 (1891); Ellis, Patent Assignments sec. 65 (1955 ed.). In deciding Fawick, we relied upon our earlier opinion in, William S. Rouverol, 42 T.C. 186 (1964), wherein we cited cases approving the division and sale of patents by fields of use. If “The monopoly right granted by the patent is the right to exclude others from making, using, or selling the Invention,” we see nothing inherently indivisible about such right. Waterman v. MacKenzie, while suggesting that patents may not be divided for purposes of sale along other than “authorized” lines, nonetheless lists geographic division as authorized. See also 35 U.S.C. sec. 261 (1970 supp.). Thus, although the cases are similar in a broad sense, we do not agree with the Court of Appeals for the Sixth Circuit that Rodgers involved “essentially the same issue” as Fawick. The Court of Claims, considering a case where the patent transferor had granted a prior “non-exclusive and irrevocable limited license” said: “By analogy, the Houde transaction would thus seem no different in principle than one in which grantor conveys a fee simple interest in land, subject to an irrevocable easement in perpetuity the grantor had previously conveyed to a third party.” (381 F.2d 1013.) This argument by analogy applies more strongly here where the transferors acquired the patent already subject to the license, and had no royalty interest after the transfer.